Paul Castronovo (PC-8538)
**PAUL CASTRONOVO, LLC**
90 Washington Valley Road
Bedminster, NJ 07921
(908) 719-8888
Attorneys for Plaintiff
Millard Leff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILLARD LEFF,<br><br>          Plaintiff,<br><br>          v.<br><br>FIRST HORIZON HOME LOAN CORPORATION, EQUIHOME MORTGAGE CORPORATION, FLAGSTAR BANK, and BANCTEL.COM, LLC,<br><br>          Defendants. | Docket No.  05-3648 (MLC-JJH)<br><br>Civil Action<br><br>**AMENDED COMPLAINT**<br>**AND JURY DEMAND** |

     Plaintiff, Millard Leff ("Plaintiff"), through his
attorney, Paul Castronovo, LLC, files this Amended Complaint and
Jury Demand seeking compensatory damages, treble damages,
punitive damages, attorneys' fees, and costs of suit from
Defendants, First Horizon Home Loan Corporation ("First
Horizon"), EquiHome Mortgage Corporation ("Equihome"). Flagstar
Bank ("Flagstar"), and Banctel.com, LLC ("Banctel")
(collectively, "Defendants"), and alleges as follows:

## FACTS

### A.  Jurisdiction and Venue

1.   Plaintiff  resides  at  2  Demott  Road,  Whitehouse Station, Hunterdon County, New Jersey.

2.   The  conventional  30-year  mortgage  at  issue  (the "Mortgage") is  secured  by  real  property  located  at  2  Demott Road, Whitehouse Station, Hunterdon County, New Jersey.

3.   All  communications  with  Plaintiff  and  Plaintiff's execution of documents occurred in New Jersey.

4.   First  Horizon  is  affiliated  with  First  Horizon National Corporation and is a wholly-owned subsidiary of First Tennessee Bank National Association conducting business in New Jersey and the United States.   It principally conducts business from 4000 Horizon Way, Irving, Texas.

5.   Equihome  is  a  privately-owned  corporation  conducting business in New Jersey and the United States.   It principally conducts business  from  150  Morristown  Road,  Bernardsville,  New Jersey.

6.   Flagstar is a public corporation conducting business in New Jersey  and  the  United  States.   It  principally  conducts business from 5151 Corporate Drive, Troy, Michigan.

7.   Banctel  is  a  limited  liability  company  conducting business in New Jersey and the United States.   It principally

conducts business from 1250 W. 14 Mile Road, Suite 100, Clawson, Michigan.

8.    This   court   possesses   federal   question   jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims under 12 U.S.C. §§ 2601 et seq., 15 U.S.C. §§ 1601 et seq., 15 U.S.C. § 1691 et seq., 15 U.S.C. §§ 6101 et seq., 12 C.F.R. § 226, and 16 C.F.R. §§ 310.1 et seq.    This court retains supplemental   jurisdiction   over   Plaintiff's   state   law   claims pursuant to 28 U.S.C. § 1367.

9.    This   court   possesses   diversity   jurisdiction   pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this matter is between citizens of different states.

10.    Pursuant to 28 U.S.C. § 1391, venue before this court is proper because a substantial part of the events or omissions giving rise to these claims occurred in Hunterdon County, New Jersey, this court retains personal jurisdiction over numerous defendants   at   this   time,   and   there   is   no   more   convenient judicial district in which this action may otherwise be brought.

**B.    Defendants Solicited a Predatory Mortgage from Plaintiff**

11.    Plaintiff is 80 years old.   He was 79 years old when Defendants Banctel and EquiHome contacted him to refinance his reverse mortgage.

12.   Prior to April 28, 2004, Plaintiff had a non-recourse reverse mortgage on his property, located at 2 Demott Road, Whitehouse Station, New Jersey (the "Reverse Mortgage").   The holder of the Reverse Mortgage was Household Senior Services, whose primary business was providing non-recourse reverse mortgages with special terms beneficial to senior citizens.   The Reverse Mortgage contained an equity reserve of approximately $80,000 which could be drawn upon as needed.

13.   On or about April 1, 2004, Millard Leff was contacted by telephone by an employee for Banctel for the purpose of soliciting a home loan which the employee claimed would save Plaintiff money.

14.   Banctel's employee told Plaintiff that Plaintiff was "at risk" (due to his age) of being removed from his home by the existing Reverse Mortgage company since he was living beyond the time that the Reverse Mortgage company had initially calculated for the Reverse Mortgage.

15.   Banctel's employee further stated that the Reverse Mortgage company could financially pursue Plaintiff's children to pay off the Reverse Mortgage if Plaintiff lived beyond the initial scope of the Reverse Mortgage calculations and then died.

16.   Banctel's employee suggested that Plaintiff not discuss the matter with Plaintiff's children, as it would cause

additional stress to Plaintiff's children if they found out they would be financially liable for the Reverse Mortgage.

17.   Hearing this, Plaintiff agreed to refinance the Reverse Mortgage where his monthly payments were $0.

18.   The mortgage application was then transferred to Steve Nabors, an EquiHome employee.   Nabors completed Plaintiff's mortgage application over the telephone and requested information about Plaintiff's income and the Reverse Mortgage.

19.   Plaintiff then supplied fax copies of older invoices and supporting data from a self-employment company.

20.   Nabors required the information to determine that Plaintiff's self-employment company had existed.

21.   At no time did Plaintiff supply W-2 or 1099 information either personally or corporately as required for income verification or proper financial disclosure; indeed Nabors never asked for such income verification.

22.   A mortgage application was completed, showing income for Plaintiff of $10,000 per month.

23.   Plaintiff never had such an income and he never stated his income at that level.

24.   Instead, Plaintiff informed Nabors that almost all of his income came from his $940 per month Social Security check.

25.   The payments of the Mortgage are $1,319 per month.

26. Nabors suggested using Robert Boak for attorney as Plaintiff did not have an attorney to complete the transaction.

27. The Mortgage was closed at the law offices of Robert Boak, representing both EquiHome and Plaintiff, on April 30, 2004.

28. The only parties present were Boak and Plaintiff. Plaintiff supplied a New Jersey Drivers License as identification.

29. The Mortgage paperwork was signed where Boak had "post-it" notations and Plaintiff left the premises with the notification from Boak that cash-out monies and paperwork due him at closing would be coming in five days.

30. Plaintiff received the cash-out check and his copy of the Mortgage papers from the closing on May 7, 2004.

31. Included in the paperwork from Boak, Plaintiff was supplied with a Tangible Benefits statement that showed "a reduction in the borrower's interest rate" and "Cash out to the borrower and/or consumer debt consolidation which exceeds prepaid finance charges plus the amount of a pre-payment penalty, if any" as the benefits of taking the Mortgage -- a 30-year conventional fixed-rate mortgage of $223,000.

32. This statement was prepared by Karri Krall, an EquiHome employee.

33. Plaintiff was supplied with an Important Applicant Information page in which an unknown person forged his signature.

34. This page also falsely indicated that Plaintiff supplied a valid State ID and a Military or Dependent ID.

35. Plaintiff was supplied with two copies of Notice of Right to Cancel the Mortgage.

36. Plaintiff received this notice on May 7, 2004 with the rest of the Mortgage papers.

37. The document states in boldface that Plaintiff had until midnight of May 4, 2004 to cancel the Mortgage.

38. Within ten days of Mortgage closure, Plaintiff was notified by mail that the Mortgage was transferred to Flagstar and that all further correspondence, inquiries, and payments were to be forwarded to Flagstar.

39. On or about June 7, 2004, Plaintiff was again contacted by a Banctel employee, Yvonne Welsh, soliciting to secure a second mortgage against the 2 Demott Road property.

40. Plaintiff was told by Welsh that she could help the Plaintiff get another fifty thousand dollars ($50,000.00) to help him out financially.

41. Plaintiff stated that he did not want the first Mortgage, and Welsh stated she could not do anything about that, but this second mortgage would help pay the first Mortgage.

42.  Welsh took a second mortgage application by phone, since Banctel already had current information on the Plaintiff.

43.  The application was completed and submitted directly to Flagstar.

44.  This mortgage application did not ask for any income information or validation and it stated to show income of $52,000 per year for Plaintiff.

45.  Welsh again attempted to call Plaintiff but spoke to Kenneth Leff, Plaintiff's son.

46.  Kenneth Leff stated that Plaintiff did not require another mortgage.

47.  This mortgage application was later denied by Flagstar.

48.  Plaintiff continued the Mortgage payments to Flagstar until November 2004.

49.  Plaintiff was hospitalized in November 2004.

50.  Plaintiff was hospitalized again in January 2005 and remained so into February 2005.

51.  On or about January 16, 2005, Plaintiff's daughter Barbara Leff-Croop took a message from Plaintiff's answering machine from an unidentified person at Flagstar requesting a return call.

52.  Leff-Croop then called the Flagstar number and informed them of Plaintiff's medical status.

53.   The Flagstar representative was only concerned about receiving payment on the Mortgage and did not want to discuss any other matters.

54.   On January 23, 2005, Kenneth Leff contacted Flagstar by telephone to notify it of Plaintiff's health status and to inquire about information on the Mortgage along with contact information of someone authorized to negotiate.

55.   At that time, Kenneth Leff was notified of the transfer of the Mortgage and that papers would be coming to the 2 Demott Road address detailing the Mortgage change and new contact information.

56.   On February 2, 2005 Plaintiff executed a Durable Power of Attorney to Kenneth Leff, enabling Kenneth Leff to administer all of Plaintiff's affairs on his behalf.

57.   This Power of Attorney was witnessed by the Nursing Supervisor at Hunterdon Medical Center and the Shift Nurse for the ICU unit at Hunterdon Medical Center.

58.   Kenneth Leff was not present at the execution of Power of Attorney and the Nursing Supervisor independently determined that it was Plaintiff's wish to sign the Power of Attorney and that he was not being coerced.

59.   During Plaintiff's hospitalization, Plaintiff received on February 6, 2005 by regular mail a notice stating that the Mortgage had been transferred to Defendant First Horizon.

9

60.  At the bottom of the notice of February 6, a notation stated that Plaintiff's Mortgage insurance could not be transferred and was cancelled and that Plaintiff should secure private mortgage insurance.

61.  On February 16, 2005, Kenneth Leff contacted by telephone First Horizon's Customer Service department.

62.  Kenneth Leff notified First Horizon verbally of the Power of Attorney and requested current documentation on the Mortgage.

63.  The First Horizon customer service representative, "Chris," gave Kenneth Leff the Customer Service fax number and a confirmation number of the conversation.

64.  Leff was promised that someone would get back to him within several days after receipt of the Power of Attorney.

65.  On February 16, 2005, Kenneth Leff faxed a qualified written request for information and a copy of the Power of Attorney agreement.

66.  This communication also contained contact information for Leff that included phone, fax, email and cellular phone numbers.

67.  On February 17, 2005, Kenneth Leff mailed to First Horizon copies of the qualified written request and power of attorney.

68.   This communication also contained contact information for Leff that included phone, fax, email and cellular phone numbers.

69.   On or about February 24, 2005, a generic form letter arrived at 2 Demott Road, Whitehouse Station, stating that it was important to contact First Horizon at its Customer Service number.

70.   On February 24, 2005, Kenneth Leff again called First Horizon Customer Service and was again told that someone would get back to him.   Leff again relayed contact information for his phone, fax, and cellular numbers.

71.   On March 10, 2005, Kenneth Leff faxed to First Horizon Customer Service another qualified written request for information and to request the name of someone to contact regarding the Mortgage.   This fax was accompanied by another copy of the Power of Attorney and contained contact information for Kenneth Leff that included phone, fax, email and cellular phone numbers.

72.   On March 11, 2005, Kenneth Leff mailed a copy of the March 10th fax and copy of the Power of Attorney to First Horizon.   This communication also relayed contact information for Kenneth Leff that included phone, fax, email and cellular phone numbers.

73. On or about March 24, 2005, a generic form letter stating that it was important to contact First Horizon was left on the outside of the mailbox by the street to the 2 Demott Road address.

74. On or about March 25, 2005, Kenneth Leff telephoned First Horizon Customer Service to determine what the status was on the qualified written requests and the name of someone to contact that would be knowledgeable about the account and had authority to negotiate. Again, Kenneth Leff was told that someone would get back to him. This communication also relayed contact information for Leff that included phone, fax, email and cellular phone numbers.

75. On or about April 4, 2005, an agent of First Horizon left another form letter outside the mailbox by the street of the 2 Demott Road address. This form letter stated that it was important to contact First Horizon Customer Service.

76. On April 5, 2005, another qualified written request was faxed on behalf of Plaintiff to First Horizon Customer Service, and a copy mailed on April 6, 2005. This communication was marked urgent, and stated that legal action would commence if no response was received.

77. On or about April 7, 2005, a voice message was left on the answering machine at Plaintiff's residence by Steve Nabors of EquiHome, stating that he was "checking out" how Plaintiff

12

was doing with the Mortgage, since it was about a year, and about the possibility of doing further business with Plaintiff. He then left his contact information including phone and email address.

78. On April 11, 2005, Kenneth Leff, on behalf of Plaintiff, mailed letters of rescission to Defendants. All were sent one copy certified return receipt, in which all receipt cards were returned. All were sent another copy certified, and a third copy to all by regular mail. The delivery and return receipt for Banctel was delayed as the mail was forwarded from the official corporate address to another address. A copy of the letter of rescission and a copy of the power of attorney were faxed twice to First Horizon Customer Service on April 12, 2005.

79. On April 13, 2005, First Horizon filed a Complaint for Foreclosure with the Superior Court of New Jersey in Hunterdon County bearing Docket No. F-6162-05.

80. On April 14, 2005, Jeff Bergida, General Counsel for Equihome, contacted Kenneth Leff by telephone.

81. Bergida acknowledged receipt of the letter of rescission, admitted to "stupidity" by various members of his company, and stated that ultimately Equihome would wind up taking back the Mortgage since the bulk of the problems originated with Equihome.

13

82.   Bergida stated that he understood the problems and that he would like to put Plaintiff back into the same position he was in before the Mortgage.

83.   Bergida requested information about the current status of the Mortgage and information about Banctel.

84.   Bergida also stated that he had had problems with Equihome using Banctel for telephone solicitations and that Banctel was subsequently dropped from use by Equihome sometime in 2004.

85.   Bergida also stated that Flagstar had previously underwritten the Mortgage and was surprised at the close corporate relationship between Banctel and Flagstar.

86.   Bergida also stated he would send a complete copy of all of the original documentation from the Mortgage and application.

87.   Bergida stated that he would be resuming conversation with Kenneth Leff stating that he either would have a definitive answer on how Equihome would help, or at least a course of action.

88.   As of June 7, 2005, no further communication of any form has been received from either Bergida or Equihome.

89.   On April 14, 2005, Bergida sent a blank email to Kenneth Leff giving his contact information.  On April 14, 2005, Kenneth Leff sent a fax to Bergida with information showing

14

Banctel and Flagstar at the same address.   Kenneth Leff also sent a letter summarizing the conversation and also stating Plaintiff's position of not wanting to litigate this matter, but trying to resolve it out of court.

90.   The Plaintiff was served the foreclosure lawsuit at the 2 Demott Road address by regular mail delivered April 16, 2005, personal service on April 17, 2005, and certified return receipt on April 24, 2005.

91.   On April 20, 2005, a letter dated April 15 and post-marked April 18, 2005 was sent to Plaintiff which stated that the matter was being turned over to an attorney for possible foreclosure, and to contact First Horizon for a workout of financial problems.

92.   On April 21, 2005, a letter was received from First Horizon, dated April 11, 2005 in an undated envelope, stating that if Plaintiff was having a hardship, to fill out the enclosed forms and return them to First Horizon Customer Service.

93.   On April 25, 2005, a letter dated April 19, 2005 and post-marked April 22, 2005, was received from First Horizon acknowledging receipt of written communication and promising a response to the written request within 60 days.

94.  On May 2, 2005, an email was received from First Horizon's attorney, Janine Getler, stating that she received the letter of rescission and hereby denied it.

95.  She further stated that, "There is no basis for your attempted rescission of the mortgage.  Mr. Leff received the Notice of Right to cancel and did not exercise his right to do so.  Any alleged 'inaccuracy' that you now complain of (we do not believe there were any) was apparent at the time of the closing."

96.  Kenneth Leff responded to this email on May 3, 2005 re-asserting the ability to rescind and pointing out some of the problems generated by the Mortgage.  Leff also suggested that the First Horizon attorney contact Equihome's counsel Jeff Bergida and to find out what problems Equihome had already admitted that they had caused.

97.  On May 4, 2005 another email was received from Ms. Getler reasserting First Horizon's position that rescission was not an available remedy, but if it was, whether Plaintiff had the money available to return to First Horizon.

98.  Kenneth Leff responded to this email the same day stating that Plaintiff could get other funding minus the amounts paid to date as well as other costs, offsetting the amounts due under rescission.  Kenneth Leff also stated that Plaintiff was still willing to negotiate with respect to the Mortgage.

16

99.  On May 5, 2005 an email was received from Ms. Getler stating that "I have been advised this morning that due to contractual issues with Flagstar Bank, First Horizon will assign this mortgage back to Flagstar.  It has also instructed us to dismiss the foreclosure which I will see to today.  Future communications with respect to this matter, should be conducted with Flagstar."  A later email communication that day contained a computer generated copy of a Letter of Dismissal directed to the court.

100. On or about May 22, 2005, the Plaintiff received a "Welcome to First Horizon" letter from Maureen Kelly, Relationship Manager for First Horizon.

101. On May 26, 2005, Kenneth Leff contacted Maureen Kelly requesting information about the status of the Mortgage or the transfer of the Mortgage to Flagstar.  Kelly denied knowing about the existence of the letter and referred Kenneth Leff to Mr. Dale Walker at First Horizon Loan Servicing.

102. On May 26, 2005, Kenneth Leff contacted Walker at the First Horizon Loan Servicing telephone number and was informed that First Horizon still held the Mortgage, which was in foreclosure, and still in the hands of the lawyers for First Horizon.

103. Walker then referred Leff to Ed Hyne of the First Horizon Legal Department and transferred Leff to Hyne's

17

extension.   An  urgent  voice  mail  message  was  left  with  all available  contact  information  for  Kenneth  Leff,  but  no  return call or paperwork has been received to date.

104. Plaintiff  and  Kenneth  Leff  have  not  received  further communication from Defendants.

105. Plaintiff  does  not  know  of  the  status  of  the  Mortgage or who currently is holding and/or servicing it.

106. Plaintiff's  credit  report  has  been  updated  to  include derogatory    information    including    foreclosure    proceedings, updated  derogatory  information  including  non-payment,  and  the like.

107. Defendants'   conduct   was   willful,   malicious   and/or especially   egregious   and   done   with   the   knowledge   and/or participation of upper level management.

108. As  a  result  of  Defendants'  wrongful  conduct  Plaintiff has  suffered  a  loss  of  equity  in  his  home  of  more  than  $223,000, exorbitant  monthly  mortgage  payments  of  $1,319  when  he  paid nothing  before  the  Mortgage,  emotional  distress,  damage  to  his credit  history,  and  the  inability  to  secure  credit  in  the future.

## COUNT I

### Common Law Fraud

109. Plaintiff  incorporates  the  preceding  paragraphs  as  if fully set forth in this paragraph.

110. Defendants Banctel, Equihome, and Flagstar affirmatively misrepresented to Plaintiff that Plaintiff would save money under the Mortgage and that Plaintiff's children would be held financially responsible for the Reverse Mortgage.

111. Defendants Banctel, Equihome, and Flagstar further misrepresented Plaintiff's financial status on his Mortgage application.

112. Defendants Banctel and Flagstar failed to disclose to Plaintiff their close corporate relationship.

113. Defendant Banctel and its President Richard Litwin in the course of their business generate mortgage "leads" for Flagstar and other banks and mortgage companies.

114. Flagstar employs Litwin as a mortgage loan manager at its branch location at 445 Elmwood, Troy, Michigan, 48083.

115. Banctel's business entity filings with the State of Michigan show Banctel's address is the same as the Flagstar branch: 445 Elmwood, Troy, Michigan, 48083. This shared address indicates that Banctel and Flagstar share office space.

116. Banctel's internet web site also displays a video showing a Flagstar representative praising Banctel for its mortgage solicitation activities.

117. The incestuous relationship between Flagstar and Banctel demonstrates that Banctel is a controlled affiliate of Flagstar as defined by 12 U.S.C. § 1841.

118. In Plaintiff's telephone conversations with Banctel employees, Banctel failed to disclose any relationships with Flagstar.   Plaintiff's subsequent telephone conversations with Banctel employee Yvonne Welsh did not disclose any relationships with Flagstar.

119. In Plaintiff's telephone conversations with Equihome employee Nabors, Equihome failed to disclose any relationships with Flagstar or Banctel.

120. The close corporate relationship between Banctel, Flagstar, and Equihome was never disclosed to Plaintiff.

121. Defendants Banctel, Flagstar, and Equihome knowingly represented to Plaintiff that there were no direct relationships among them, that the relationships and documentation relating to them were of generally accepted commercial standards, and reflected the true relationships of them.

122. There were no Provider Relationship documents at closing relating directly to Flagstar, Banctel, or Equihome.

123. The Defendants owed the Plaintiff a duty to disclose the relationships, and by not doing so the representations made were false, fraudulent, and misleading.

124. Defendants Banctel, Equihome, and Flagstar knew at the time they made these representations to Plaintiffs that they were false.

20

125. Defendants Banctel, Equihome, and Flagstar intended to deceive Plaintiff with these false representations.

126. Plaintiff believed Defendants Banctel, Equihome, and Flagstar's representations and justifiably relied on them when he executed the Mortgage application, the Mortgage, the accompanying note, and other transactional documents.

127. As a result of Defendants Banctel, Equihome, and Flagstar's wrongful conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

**COUNT II**

**New Jersey Home Ownership Security Act of 2002**

128. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

129. The Mortgage is a "high-cost home loan" under The New Jersey Home Ownership Security Act, N.J.S.A. 46:10B-22 et seq.

130. The New Jersey Home Ownership Security Act was enacted to fight abusive lending due to loans that are equity-based rather than income based.   It further states that a "lender's ability to sell loans reduces the incentive to ensure that the homeowner can afford the payments of the loan."

131. The New Jersey Home Ownership Security Act prohibits a refinancing where the scheduled monthly payment is more than

twice as large as the average of the earlier scheduled monthly payments.

132. The New Jersey Home Ownership Security Act also requires all lenders to provide a clear and prominent notice of a debtor's legal rights.

133. Defendants Equihome, Flagstar, and First Horizon violated the New Jersey Home Ownership Security Act because the Mortgage's $1,319 monthly payment is more than twice the amount of Plaintiff's $0 average monthly payment under the Reverse Mortgage.

134. Defendants Equihome, Flagstar, and First Horizon also violated the New Jersey Home Ownership Security Act because they failed to provide Plaintiff with the required disclosures.

135. As a result of Defendants Equihome, Flagstar, and First Horizon's wrongful conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

## COUNT III

### RESPA

136. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

137. Plaintiff was not given the right of rescission that is required under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. 2614 et seq.

138. Plaintiff was provided the Mortgage paperwork and the Notice of Right To Cancel papers after May 5, 2004.

139. Highlighted prominently in boldface on the Notice of Right to Cancel paperwork is a deadline date of midnight on May 4, 2004, leading Plaintiff to believe that he had no further right of rescission.

140. Plaintiff was presented a document at closing which asked approval for using overnight delivery services to speed closing paperwork.

141. Plaintiff refused using overnight services at extra cost to Plaintiff by not signing the document.

142. The HUD-1 document provided to Plaintiff after May 5, 2004 shows on line item 1304 a charge for Federal Express of fifty dollars ($50.00) which was not disclosed and is inaccurate. The charges were not approved of prior to closing.

143. Equihome violated RESPA and implementing regulations, 24 C.F.R. § 3500.14 by charging for services not provided and not approved by Plaintiff.

144. Kenneth Leff had Power of Attorney and the full legal authority to act on Plaintiff's behalf after February 2, 2005.

145. Kenneth Leff submitted qualified written requests by fax and regular mail to First Horizon on February 16, February 17, March 10, March 11, April 5, April 6, April 11, and April 12, 2005.

146. To date, First Horizon has not acknowledged or responded to the qualified written request as required under 24 C.F.R. § 3500.21.

147. Under 24 C.F.R. § 3500.21, First Horizon was obligated to withhold or update any of Plaintiff's credit information about any overdue payments to the credit reporting agencies.

148. First Horizon on multiple occasions reported adverse information on Plaintiff's credit to the credit reporting agencies while ignoring the 60-day rule.

149. On April 11, 2005 a letter of rescission and a copy of the Power of Attorney were mailed to all Defendants.   Each Defendant received a copy by regular mail, a copy by certified mail, and a copy by certified mail.

150. On April 12, 2005, a copy of the letter of rescission and Power of Attorney were faxed to First Horizon Customer Service.   Approximately five minutes later, another copy of the letter of rescission and Power of Attorney were faxed to First Horizon Customer Service.   Both transmissions received successful transmission receipts on the originating machine.

151. On May 2, 2005 and May 3, 2005, First Horizon denied Plaintiff's right to rescission.

152. The exact status of the Mortgage cannot be determined, the exact current owner or servicer cannot be determined.   On information and belief, the Mortgage still resides with First Horizon.

153. Kenneth Leff submitted two separate copies of a qualified written request by mail along with copies of the Power of Attorney to Flagstar on April 11, 2005.

154. Flagstar has not acknowledged or responded to Plaintiff's qualified written request as required under 24 C.F.R. § 3500.21.

155. Plaintiff received on February 6, 2005 one notice by regular mail notifying Plaintiff that the Mortgage had been transferred and that the new servicer of the Mortgage would be First Horizon.

156. Plaintiff was not given proper 15-day minimum notice of transfer as provided under 24 C.F.R. § 3500.21.

157. The lack of proper notice ahead of the transfer did not allow Plaintiff to object to or question the transfer.

158. Under 15 U.S.C. § 1635 et seq., Plaintiff had and continues to have the right of rescission.   First Horizon, or whomever now holds the Mortgage, has not released the security interest in Plaintiff's property.

25

159. Plaintiff seeks damages pursuant to 15 U.S.C. § 1640(a) and all applicable regulations.

160. As a result of Defendants Equihome, Flagstar, and First Horizon's wrongful conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

### COUNT IV

### Truth in Lending Act

161. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

162. Before the Mortgage, Plaintiff had the Reverse Mortgage with a $0 monthly payment.  The Reverse Mortgage provided a cash payment upon closing and an approximate equity reserve of eighty thousand dollars ($80,000.00) which Plaintiff could draw upon as needed.

163. Equihome violated the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 et seq., and Regulation Z, 12 C.F.R. §§ 226 et seq., by providing documentation to Plaintiff which was false, deceptive, and misleading.

164. Equihome through it employee Karri Krall provided a Tangible Benefits Statement to Plaintiff stating that one of the benefits of the Mortgage was "A reduction in the borrower's interest rate."

26

165. Equihome's statements on the Tangible Benefits Statement are false.

166. Equihome knew these statements were false when made.

167. Equihome intended to deceive Plaintiff with these false representations.

168. Plaintiff believed Equihome's representations and justifiably relied on them when he agreed to the Mortgage.

169. As a result of Defendant Equihome's wrongful conduct, Plaintiff has suffered, and continues to suffer, ascertainable losses including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

## COUNT V

### New Jersey Consumer Fraud Act

170. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

171. Plaintiff is protected by the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.

172. Banctel solicited the Mortgage application from Plaintiff through deception and/or knowing omission of material facts pertaining to Plaintiff's Reverse Mortgage.

173. Equihome solicited the Mortgage from Plaintiff through deception and/or knowing omission of material facts pertaining

to Plaintiff's Reverse Mortgage and the tangible benefits of the Mortgage.

174. Flagstar, through its agent Banctel, solicited the Mortgage application from Plaintiff through deception and/or knowing omission of material facts pertaining to Plaintiff's Reverse Mortgage.

175. Defendants Banctel, Equihome, and Flagstar engaged in an unconscionable practice using deception, fraud, false pretense, false promise, and misrepresentation to force Plaintiff into the Mortgage against Plaintiff's interests.

176. Defendants Banctel, Equihome, and Flagstar knew at the time they made these representations to Plaintiff that these representations were false.

177. Defendants Banctel, Equihome, and Flagstar intended to deceive Plaintiff with these false representations.

178. Plaintiff believed Defendants Banctel, Equihome, and Flagstar's representations and justifiably relied on them when he agreed to the Mortgage.

179. As a result of Defendants Banctel, Equihome, and Flagstar's wrongful conduct, Plaintiff has suffered, and continues to suffer, ascertainable losses including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

180. Defendants Banctel, Equihome, and Flagstar's acts violate the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and applicable regulations.

## COUNT VI

### Negligent Misrepresentation

181. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

182. Defendants Banctel, Equihome, and Flagstar owed a duty to Plaintiff to use the care and prudence in mortgage lending ordinarily employed by banks and mortgage lenders in New Jersey.

183. Defendants Banctel, Equihome, and Flagstar breached this duty to Plaintiff by negligently misrepresenting that Plaintiff would save money under the Mortgage and that Plaintiff's children would be held financially responsible for his Reverse Mortgage.

184. Defendants Banctel, Equihome, and Flagstar further negligently misrepresented Plaintiff's financial status on his Mortgage application.

185. Defendants Banctel and Flagstar negligently failed to disclose to Plaintiff their close corporate relationship.

186. Plaintiff believed Defendants Banctel, Equihome, and Flagstar's negligent misrepresentations and justifiably relied on them when he agreed to refinance his no-payment Reverse Mortgage with the Mortgage.

187. As a result of Defendants Banctel, Equihome, and Flagstar's negligent conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

## COUNT VII

### Breach of Fiduciary Duty

188. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

189. Defendants Banctel, Equihome, and Flagstar owed a duty to Plaintiff to act with reasonable care and in accordance with generally accepted commercial practices in soliciting and generating mortgages.

190. Defendants Banctel, Equihome, and Flagstar knew or should have known that the Mortgage information provided to Plaintiff was material to the loan process and that the information and guidance provided to Plaintiff was false or fraudulent and otherwise not in accordance with generally accepted commercial practices.

191. Defendants Banctel, Equihome, and Flagstar owed a duty to report any incorrect or false or fraudulent information to Plaintiff, to refrain from issuing fraudulent or false or misleading information, and to refrain from making mortgages based upon fraudulent or false or and misleading information.

192. Defendants Banctel, Equihome, and Flagstar breached this fiduciary duty to Plaintiff by misrepresenting the consequences of his Reverse Mortgage, duping Plaintiff into the Mortgage with no tangible benefit to him, and misrepresenting his financial information on the application for the Mortgage.

193. As a result of Defendants Banctel, Equihome, and Flagstar's wrongful conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

**COUNT VIII**

**New Jersey Fair Foreclosure Act**

194. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

195. The New Jersey Fair Foreclosure Act, N.J.S.A. 2A:50-53 et seq., provides that, prior to commencing any foreclosure or other legal action, the lender must give at least 30 days prior written notice of intention to foreclose.

196. Defendant First Horizon failed to supply notice as required by the N.J.S.A. 2A:50-56 before commencing suit to foreclose on Plaintiff's residence.

197. In further violation of the New Jersey Fair Foreclosure Act, Defendant First Horizon rapidly filed for foreclosure after it received by fax two copies of Plaintiff's

letter of rescission but before Defendant First Horizon received the letter of rescission by certified mail.

198. As a result of Defendant First Horizon's wrongful conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

## COUNT IX

### Equal Credit Opportunity Act

199. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

200. Plaintiff was 79 years old at the time Defendants Banctel, Equihome, and Flagstar solicited Plaintiff for the Mortgage.

201. Defendants Banctel, Equihome, and Flagstar targeted Plaintiff for the Mortgage due to his vulnerable status as a senior citizen.

202. Defendants Banctel, Equihome, and Flagstar's targeting of Plaintiff is part of a pattern and practice of age discrimination through predatory lending where senior citizens, such as Plaintiff, are stripped of equity in their homes with no tangible benefit, pressured into cash-out refinances knowing Plaintiff and other senior citizens need cash due to medical bills and other financial strains, duped into unnecessary loan

32

products, and conned into loans requiring monthly payments that are more than Plaintiff and other senior citizens can pay.

203. Defendant First Horizon engaged in predatory lending and collection practices by knowingly taking advantage of Plaintiff's hospitalization in order to rush a foreclosure action.

204. Defendants' predatory lending and collection practices would not have occurred but for Plaintiff's age of 79 years old at the time.

205. Defendants' conduct was willful, malicious and/or especially egregious and done with the knowledge and/or participation of upper level management.

206. Defendants' conduct violates the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq.

207. As a result of Defendant First Horizon's wrongful conduct, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

## COUNT X

### Telemarketing Consumer Fraud and Abuse Prevention Act

208. Plaintiff incorporates the preceding paragraphs as if fully set forth in this paragraph.

209. Defendants Banctel, Equihome, and Flagstar contacted Plaintiff by telephone to solicit the Mortgage.

210. The above-stated misrepresentations by Defendants Banctel, Equihome, and Flagstar are misrepresentations covered by the Telemarketing Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 et seq. (the "Act"), and the Telemarketing Sales Rule (the "Rule"), 16 C.F.R. §§ 310.1 et seq.

211. These misrepresentations violate both the Act and the Rule.

212. Defendants Equihome and Flagstar also provided substantial assistance to Defendant Banctel, such as providing consumer lists, marketing materials, and/or appraisals of loan offers, when they knew or consciously avoided knowing that Defendant Banctel was engaged in unlawful conduct.

213. As a result of Defendants Banctel, Equihome, and Flagstar's violations of the Act and the Rule, Plaintiff has suffered, and continues to suffer, damages including: loss of equity in his home of more than $223,000, exorbitant monthly mortgage payments, emotional distress, damage to his credit history, and attorneys' fees and costs.

**WHEREFORE,** Plaintiff seeks judgment on each count against Defendants awarding him compensatory damages, treble damages, punitive damages, attorneys' fees, costs of suit, pre- and post-

judgment interest, and all other relief that the Court deems equitable and just.

**PAUL CASTRONOVO, LLC**

Dated: September 2, 2005            By: _____

Paul Castronovo
Attorney for Plaintiff

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

**PAUL CASTRONOVO, LLC**

Dated: September 2, 2005            By: _____

Paul Castronovo
Attorney for Plaintiff

## DESIGNATION OF TRIAL COUNSEL

Plaintiff designates Paul Castronovo as trial counsel in this action.

**PAUL CASTRONOVO, LLC**

Dated: September 2, 2005            By: _____

Paul Castronovo
Attorney for Plaintiff