**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MILLARD LEFF, | : | CIVIL ACTION NO. 05-3648 (MLC) |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| v. | : |  |
| FIRST HORIZON HOME LOAN CORPORATION, et al., | : |  |
| Defendants. | : |  |

**COOPER, District Judge**

Plaintiff, Millard Leff ("Leff"), commenced this action against defendants, First Horizon Home Loan Corporation ("First Horizon"), Equihome Mortgage Corporation ("Equihome"), Flagstar Bank ("Flagstar"), and Banctel.com, LLC, alleging, inter alia, fraud, negligent misrepresentation, and violations of the Equal Credit Opportunity Act and Telemarketing Consumer Fraud & Abuse Prevention Act. (Compl.) Flagstar filed cross claims against First Horizon and Equihome alleging breach of contract and fraud. (Dkt. entry no. 76.) Moreover, Equihome filed cross claims seeking contribution and indemnification from First Horizon, Flagstar, and Banctel.com, LLC. (Dkt. entry no. 37.)

The parties entered into a voluntary stipulation on May 5, 2006, pursuant to which (1) Leff dismissed all of his claims against First Horizon and Flagstar, (2) First Horizon and Flagstar dismissed all of their counterclaims against Leff, and (3) Equihome dismissed its cross claims against First Horizon. (Dkt.

entry no. 79, 82.)  On May 8, 2006, the parties entered into a second voluntary stipulation pursuant to which (1) Leff dismissed all of his claims against Banctel.com, LLC, and (2) First Horizon, Flagstar, and Equihome dismissed all of their cross claims against Banctel.com, LLC.  (Dkt. entry no. 81.)  Thus, Leff's only remaining claims in this action are against Equihome.

Equihome now moves for summary judgment.  (Dkt. entry no. 95.) Further, Flagstar moves for summary judgment on both its cross claims against Equihome and Equihome's cross claims against it. (Dkt. entry no. 86.)  Flagstar also moves to impose sanctions against Equihome and its counsel pursuant to Federal Rule of Civil Procedure ("Rule") 11 and 28 U.S.C. § ("Section") 1927.  (Dkt. entry no. 87.)  For the reasons stated herein, the Court will (1) deny Equihome's motion for summary judgment with respect to count one (common law fraud), count five (New Jersey Consumer Fraud Act), and count six (negligent misrepresentation), of the complaint, (2) grant Equihome's motion for summary judgment with respect to count nine (Equal Credit Opportunity Act) and count ten (Telemarketing Consumer Fraud & Abuse Prevention Act) of the complaint, (3) deny Flagstar's motion for summary judgment with respect to its cross claims against Equihome, (4) grant Flagstar's motion for summary judgment with respect to Equihome's cross claims against it, and (5) deny Flagstar's motion to impose sanctions.

## BACKGROUND

### I.   The Relevant Parties

Leff resides at 2 Demott Road, Whitehouse Station, New Jersey (the "Property").  (Equihome Br., at 5.)  He is eighty-one and suffers from a number of medical conditions including, "mild dementia" and "degenerative brain function".  (Pl. Br., at 5.) As a result, Leff's son, Kenneth Leff, has durable power of attorney over all of Leff's affairs.  (Id.)  Leff receives monthly social security checks in the amount of $964. (Castronovo Cert., Ex. A, Leff Dep. Tr., at 74.)

Leff, at all times relevant to the complaint, was the owner and operator of Kenbar Industries, a sole proprietorship that assembled and sold water reading devices.  (Equihome Br., at 5.) Leff testified that he sold approximately 4,000 water reading devices in the twelve-month period proceeding Kenbar Industries ceasing operations following Leff's hospitalization in July 2005. (Coffey Cert., Ex. 1, Leff Dep. Tr., at 22, 26.)  Leff also testified that Kenbar Industries sold two types of water reading devices during that period, one for thirty dollars and the other for thirty-five dollars.  (Id. at 26-27.)  However, Kenneth Leff testified that he did not believe the figures his father quoted with respect to his work product for 2004 were accurate. (Castronovo Cert., Ex. A., Kenneth Leff Dep. Tr., at 263-64.) Further, Kenneth Leff stated that according to his father's

invoice book, his "net income from the Kenbar stuff was approximately $4,000 over the time frame of 2003, 2004." (Id. at 312.)

Equihome is a mortgage lending corporation with its principal place of business in Bernardsville, New Jersey. (Equihome Br., at 5.) Flagstar is a public lending corporation that also operates as a financial underwriter. (Id.) Flagstar's principal place of business is in Troy, Michigan. (Compl., at ¶ 6.)

## II. Leff's Mortgage Loan

Equihome performed a random credit check on Leff, which revealed "serious delinquencies" on several credit accounts. (Pl. Br., at 7.) Nevertheless, Equihome's employee and broker, Steve Nabors, contacted Leff by telephone several days later, and asked Leff to consider refinancing his then existing reverse mortgage with Household Senior Services into a thirty-year conventional mortgage with Equihome. (Id. at 6.) Leff and Nabors spoke about Leff "completing a mortgage application with Equihome for a 'no-income' or 'stated-income' verification mortgage refinance loan which would include cash to the borrower (i.e., Leff) of approximately $50,000." (Equihome Br., at 6.) Moreover, Nabors obtained information from Leff regarding his current mortgage on the Property, the estimated value of his home, and his income sources. (Id. at 6-7.)

4

Nabors completed and signed a mortgage application for Leff based on the information he obtained during their telephone conversation. (Id. at 7.)  The mortgage application stated that Leff (1) owned the Property, which was worth approximately $375,000, (2) had an outstanding mortgage on the Property in the amount of approximately $150,000, (3) owned Kenbar Industries and had an income of approximately $10,000 per month, (4) had monthly credit card payments totaling approximately $1,633, and (5) desired to receive $50,000 in cash at the mortgage loan closing. (Id.)  Thereafter, Nabors sent a letter to Leff requesting, among other things, that Leff review a copy of the mortgage loan application for accuracy and missing information and sign and return certain documents attached to the letter. (Id. at 7-8.)

Leff faxed Nabors a copy of an Account Statement from Household Senior Services on March 18, 2004, which stated that under Leff's then existing reverse mortgage his (1) home equity line of credit had an annualized percentage rate of eight percent and a balance as of February 14, 2004 of $161,133.95, and (2) approved line of credit was $88,200 but only $90.13 of available credit remained. (Id. at 8.)  Leff testified that he believed his credit limit under the Household Senior Services reverse mortgage was approximately $70,000 and he "suspected" he was close to that credit limit when he first spoke to Nabors. (Castronovo Cert., Ex. A., Leff. Dep. Tr., at 206.)  However, Leff also testified

5

that a Household Senior Services representative had told him that if he "kept [his] balance in good order, . . . they would increase the monies available to [him] in a certain amount on a yearly basis." (Id. at 207.)

The Property was appraised on April 2, 2004 for $425,000. (Equihome Br., at 9.)  Nabors revised Leff's mortgage loan application to reflect additional information gathered during the appraisal and loan application process, and forwarded a copy of the revised loan application to Leff.  (Id. at 8.)  On April 7, 2004, Leff obtained counsel to represent him in connection with the closing of the mortgage loan transaction with Equihome.  (Id. at 9.)  That same day, Leff signed a copy of the mortgage loan application and sent it to Equihome.  (Id. at 8.)

Equihome's underwriter, Flagstar, sent Equihome its conditional approval of Leff's mortgage loan on April 12, 2004. (Id. at 9.)  The conditional approval required that, prior to closing, Leff or Equihome must simultaneously provide (1) a CIP Patriot Act Certification Form or a photocopy of an unexpired government issued identification card, (2) a copy of Leff's social security card, and (3) a letter from Leff's accountant verifying that his business existed for at least two years and paid taxes annually.  (Id.)  Nabors obtained the requested documents and information from Leff and sent them to Flagstar on April 20 and 21, 2004.  (Id. at 10-11.)  Flagstar, in turn, sent

Nabors a Wholesale Commitment Letter stating that no additional conditions needed to be met prior to closing.  (Id. at 11.)

The closing occurred on April 30, 2004 at the office of Leff's counsel.  (Id.)  Equihome provided Leff with a thirty-year mortgage loan in the amount of $223,000 with a fixed interest rate of 5.875% (the "Loan").  Further, on May 3, 2004, Equihome gave Leff a check in the amount of $52,000 in connection with the Loan, which Leff deposited into Kenbar Industries' bank account. (Id. at 11-12.)  On the closing date, Household Senior Services was paid $88,291.40 constituting the outstanding principal balance of its reverse mortgage loan and $75,941.67 constituting the outstanding finance charges.  (Id. at 13.)

Leff did not have any monthly payments under the Household Senior Services reverse mortgage.  (Castronovo Cert., Ex. A., Leff Dep. Tr., at 113.)  Leff's monthly payments under the Loan, however, are $1,319.13.  (Equihome Br., at 11.)  Leff made such payments on June 14, 2004, June 30, 2004, July 24, 2004, August 27, 2004, September 30, 2004, and October 30, 2004.  (Id. at 12.) Accordingly, Leff paid a total of $7,914.78 towards the Loan. (Id.)  Leff has not made any payments towards the Loan since October 30, 2004.  (Pl. Br., at 10.)

## III. Transfer of the Loan

Flagstar entered into a Correspondent Lending Agreement with Equihome on May 9, 2001.  (Defendant Flagstar's Statement of

Undisputed Material Facts as to Defendant Equihome Mortgage
Corporation ("Flagstar's Statement of Facts"), at ¶ 2.)  On May
23, 2001, Flagstar and Equihome entered into a Wholesale Lending
Broker Agreement (together with the Correspondent Lending
Agreement, the "Agreements").  (Id. at ¶ 3.)  The Agreements set
forth the terms and conditions governing Flagstar's agreement to
purchase and Equihome's agreement to sell certain residential
mortgage loans.  (Daly Aff., Ex. A, Correspondent Lending Agmt.,
at 7; Daly Aff., Ex. B., Wholesale Lending Broker Agmt., at 1.)

       The representations and warranties sections in the
Agreements state, inter alia, that "all Mortgage Loan Documents
submitted by [Equihome] for each Mortgage Loan are in every
respect valid and genuine" and "each Mortgage Loan sold to
Flagstar is not a 'High Cost Loan' or 'predatory loan'" as those
terms are defined in the Home Ownership and Equity Protection Act
of 1994 or any other state law or municipal ordinance.
(Flagstar's Statement of Facts, at ¶ 7.)  Moreover, the
indemnification sections provide in relevant part:

       3.1   Indemnification of Flagstar by Seller
             (a)   [Equihome] hereby agrees to indemnify and
                   hold harmless Flagstar, its successors and/or
                   assigns, from any and all losses,
                   liabilities, claims, damages, or costs of any
                   nature, including without limitation
                   attorneys' fees and costs, and actions
                   suffered or incurred by Flagstar which arise
                   out of, result from, or relate to: i.) the
                   breach of [Equihome] of any covenant,
                   condition, term, obligation, representation
                   or warranty contained in this Agreement . . .

8

> or in any written statement, certification or
> Mortgage Loan Document furnished by
> [Equihome] pursuant to this Agreement . . .;
> or ii.) any material act or omission of
> [Equihome] or any employee or agent of
> [Equihome] which adversely affects any
> Mortgage Loan registered with and funded by
> Flagstar.

(<u>Id.</u>)  Further, the Agreements require Equihome to "immediately

repurchase at the repurchase price, any mortgage loan sold to

Flagstar" under certain circumstances including the following:

> (b)  Flagstar reveals any evidence of fraud in the
> origination and closing of the Mortgage Loan by
> i.) [Equihome] or its employees, directors,
> officers, agents, and independent contractors . .
> . ; or the Borrower.
> (c)  If Flagstar determines the Mortgage Loan is not
> eligible under the Mortgage Loan Program for which
> it was registered and delivered by the Seller.
> . . . .
> (f)  Flagstar is required to repurchase said Mortgage
> Loan from Fannie Mae, Freddie Mac, or any other
> third party investor for any reason involving the
> origination or losing [sic] of the Mortgage Loan.

(<u>Id.</u> (emphasis omitted).)

Flagstar purchased the Leff Loan on May 7, 2004 pursuant to

the Agreements.  (<u>Id.</u> at ¶ 14.)  Thereafter, Flagstar sold the

Loan to First Horizon.  (<u>Id.</u> at ¶ 15.)  Under the terms of its

agreement with First Horizon, Flagstar was required to repurchase

the Loan and corresponding note under certain circumstances.

(<u>Id.</u> at ¶ 16.)

First Horizon commenced foreclosure proceedings on the

Property after Leff defaulted on his payment obligations under

the Loan.  (Pl. Br., at 10.)  However, First Horizon withdrew the

foreclosure proceedings after it learned that there were
contractual problems with the Loan.  (Id.)  As a result, First
Horizon demanded that Flagstar repurchase the Loan and cited
"Broker Misrep." as its reason.  (Flagstar's Statement of Facts,
at ¶ 18.)  Flagstar repurchased the Loan in November 2005.  (Id.
at ¶ 17.)

**IV.  This Action**

Kenneth Leff, on behalf of his father, commenced this action
in the Superior Court of New Jersey against the defendants
alleging that they engaged in various predatory lending practices
in connection with the Loan.  (Compl.; Equihome Br., at 3.)
First Horizon removed the action to this Court.  (Equihome Br.,
at 3.)  Moreover, First Horizon demanded that Flagstar defend and
indemnify it with respect to Leff's claims pursuant to their
parties' agreement.  (Flagstar's Statement of Facts, at ¶ 19.)

Flagstar sent a letter to Equihome on November 15, 2005
demanding that Equihome immediately (1) repurchase the Leff Loan
and the corresponding mortgage and note, (2) indemnify Flagstar
from all losses, liabilities, claims, and actions "which arise
out of, result from, or relate to Equihome's breaches of
covenants, conditions, terms, obligations, representation or
warranties, or Equihome's acts or omissions which adversely
affect the [Loan]", and (3) defend the Loan against all claims,
including Leff's claims against Flagstar.  (Id. at ¶ 20.)

10

Equihome dismissed its counsel in December 2005, and retained new counsel, Gregory Coffey. (Id. at ¶¶ 24, 27.) Flagstar reiterated its repurchase demand to Coffey in a letter dated December 22, 2005. (Id. at ¶ 27.) Flagstar contends that "[a]lthough Mr. Coffey acknowledged Equihome's obligation and said he would urge his client to do so, Equihome never responded." (Id.) To date, Equihome has not repurchased the Loan, indemnified Flagstar with respect to Leff's claims, or defended Flagstar in this action. (See id. at ¶ 45.)

Leff contends that the circumstances underlying this action contain the "hallmarks of predatory lending" with respect to Equihome because (1) Equihome solicited Leff for a loan, (2) Leff suffered "net harm" from the refinance of his reverse mortgage, and (3) Equihome falsified Leff's income on his mortgage loan application. (Pl. Br., at 1-2.) Nevertheless, Leff states in his brief opposing Equihome's motion for summary judgment that he is voluntarily dismissing count two (New Jersey Home Ownership Security Act), count three (Real Estate Settlement Procedures Act), count four (Truth in Lending Act), and count seven (Breach of Fiduciary Duty) of the complaint. (Id. at 2; Compl.) Leff's common law fraud (count one), New Jersey Consumer Fraud Act (count five), negligent misrepresentation (count six), Equal Credit Opportunity Act (count 9), and Telemarketing Consumer Fraud & Abuse Prevention Act (count 10) claims remain at issue. (Compl.)

11

**DISCUSSION**

**I.   Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the

12

[non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II. Equihome's Motion for Summary Judgment

### A.  Leff's Statutory and Common Law Fraud Claims

The New Jersey Consumer Fraud Act ("CFA") provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate . . . whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2. To state a claim under the CFA, a private plaintiff must show that (1) the defendant committed an unlawful

13

practice that violates it, (2) the plaintiff suffered an ascertainable loss as a result of the unlawful conduct, and (3) a causal relationship exists between the unlawful practice and the plaintiff's loss.  <u>Szczubelek v. Cendant Mortg. Corp.</u>, 215 F.R.D. 107, 121 (D.N.J. 2002).  Unlawful practices include affirmative acts, omissions, and violations of state regulations.  <u>Id.</u> at 125.  Affirmative acts do not require a showing of the defendant's intent.  <u>Id.</u>  Accordingly, "a defendant who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence or the intent to deceive."  <u>Id.</u>  In contrast, the plaintiff must show knowledge or intent to commit fraud when the alleged unlawful practice is an omission.  <u>Id.</u>

To establish a claim for common law fraud under New Jersey law, a plaintiff must show (1) that the defendant made a material misrepresentation of a presently existing or past fact, (2) the defendant knew or believed the statement was false, (3) the defendant intended for the plaintiff to rely on the misrepresentation, (4) the plaintiff relied on the misrepresentation, and (5) the plaintiff was damaged.  <u>Angrisani v. Capital Access Network, Inc.</u>, 175 Fed.Appx. 554, 556 (3d Cir. 2006).  However, "[s]tatements as to future or contingent events, as to expectations and probabilities, or as to what will be or is intended to be done in the future, do not constitute

14

misrepresentations even though they turn out to be false, at least where they are not made with intent to deceive, and where the parties have equal means of knowledge." Id.  Similarly, "puffery" and "ill-defined opinions" also do not constitute misrepresentations.  Id.

Equihome contends that Leff is an experienced businessman who understood the relative financial obligations of both a reverse mortgage and a conventional mortgage at the time he entered into the Loan.  (Equihome Br., at 26-28.)  Equihome further contends that Leff cannot establish his fraud claims because Equihome properly and accurately advised Leff, prior to his entering into the Loan, that the tangible benefits of the Loan would be a $52,000 cash payment and a lower interest rate. (Id. at 28-29.)  Also, Equihome argues that Leff has produced no evidence to support its accusations that Equihome (1) misrepresented to Leff that he would save money if he obtained an Equihome mortgage, (2) told Leff that his children would be financially responsible for the reverse mortgage, (3) misrepresented Leff's financial status on his mortgage loan application, (4) failed to disclose any relationships it has with Flagstar or Banctel.com, LLC, and (5) failed to inform Leff that the Loan would be sold.  (Id. at 30-37.)

Leff, in contrast, asserts that Equihome's "predatory lending" constitutes an "unconscionable commercial practice" in violation of the CFA.  (Pl. Br., at 13.)  Specifically, Leff

15

asserts that Equihome engaged in predatory lending because (1) he is elderly, low income and was "totally confused" by the mortgage loan paperwork, (2) his $965 monthly social security check is insufficient to pay the $1,319 monthly payments required by the Loan, (3) Equihome solicited the Loan, did all leg work related to the Loan, and falsified Leff's income level on the loan application, (4) Equihome received $13,909.54 for ten hours of work in connection with the Loan, and (5) the Loan was based on Leff's equity in the Property rather than his ability to make the payments required by the Loan.  (Id. at 15.)  Leff also claims that Equihome's general counsel, Jeffrey Bergida, admitted during tape recorded calls, inter alia, "if someone is in a reverse mortgage [like Leff], they can't be benefitted by getting out of it, that's it.  There isn't a tangible benefit, and certainly of taking a senior citizen out of a reverse mortgage. . . ."  (Id. at 10, 15.)[1]

---

[1] Equihome argues that all statements contained in the transcripts of Bergida's tape recorded conversations with Kenneth Leff are inadmissable because (1) the recordings have not been authenticated, (2) Bergida was not aware that his conversations with were being recorded and did not consent to being recorded, and (3) the tape recorded conversations were conducted in furtherance of pre-litigation settlement discussions, and thus, are confidential.  (Equihome Response Br., at 9.)  Leff argues, in contrast, that because the tape recorded conversations between Kenneth Leff and Bergida do not violate any wiretap statute and do not pertain to settlement discussions, they are admissible evidence.  (Pl. Br., at 21-24.)  The Court finds that without considering Bergida's tape recorded statements, genuine issues of fact exist with respect to Leff's fraud claims.  Thus, the Court need not address the admissibility of the transcripts of Bergida's recorded conversations with Kenneth Leff at this time.

Leff and Equihome's conflicting assertions preclude summary judgment here because questions of fact as well as issues of credibility and reliance exist.  Specifically, the parties offer conflicting evidence regarding whether Equihome's representative or general counsel made the statements Leff alleges, whether Equihome deliberately falsified Leff's income on the loan application, whether Equihome's statements and actions constitute unconscionable commercial practices, and whether Leff relied on the alleged misrepresentations and suffered an "ascertainable loss".  These are clearly questions of fact that remain in dispute.  See <u>Szczubelek</u>, 215 F.R.D. at 126.  Therefore, Equihome's motion for summary judgment must be denied with respect to Leff's common law and statutory fraud claims.

### B. **Leff's Telemarketing Consumer Fraud & Abuse Prevention Act Claim**

The Telemarketing Consumer Fraud & Abuse Prevention Act ("TCFAA") permits:

> Any person adversely affected by any pattern or practice of telemarketing which violates any rule of the Commission . . . may, within 3 years after discovery of the violation, bring a civil action in an appropriate district court of the United States against a person who has engaged or is engaging in such pattern or practice of telemarketing if the amount in controversy exceeds the sum or value of $ 50,000 in actual damages for each person adversely affected by such telemarketing.

15 U.S.C. § 6104(a); <u>see</u> <u>800-JR Cigar, Inc. v. Goto.com, Inc.</u>, 437 F.Supp.2d 273, 296 (D.N.J. 2006) (explaining that TCFAA

17

permits persons who are "adversely affected" to bring a civil action against a deceptive telemarketer).  A plaintiff must serve the Federal Trade Commission ("FTC") with prior written notice of any such action and attach a copy of the complaint.  15 U.S.C. § 6104(b).  If prior written notice is not feasible, the plaintiff may serve notice immediately after it commences the action.  Id. Section 310 of the Telemarketing Sales Rule implements the TCFAA. See 16 C.F.R. § 310.  This section prohibits "deceptive telemarketing acts or practices".  16 C.F.R. § 310.3.

Leff first asserted a claim under the TCFAA in his amended complaint, which was filed on September 15, 2005.  (Pl. Br., at 16.)  Leff served the FTC with written notice of its TCFAA claim and attached a copy of the amended complaint.  (Castronovo Cert., Ex. J, 9-15-05 Letter to FTC.)  Thus, Leff complied with the TCFAA's procedural notice requirement.

Equihome argues that Leff's TCFAA claim cannot stand because Leff has not established that Equihome contacted him first. (Equihome Br., at 42.)  "[P]ursuant to the recollections of Nabors, plaintiff contacted Equihome."  (Id.)  In the alternative, Equihome argues that even if it did contact Leff first, Leff signed documents permitting Equihome to contact him and Leff cannot establish any "pattern" of telemarketing.  (Id. at 42-43.)

Leff argues that Equihome engaged in deceptive telemarketing, which induced him to enter into the Loan, when its agent warned Leff "not to talk about the refinance with his children to avoid causing them aggravation and worry about being financially liable for the reverse mortgage when he died and that [he] would be thrown out in the street if he outlived his reverse mortgage." (Id. at 16-17.)  However, during his deposition, Leff expressly denied that Equihome's agent, Nabors, made any such statements.  (Coffey Cert., Ex. 1, Leff Dep. Tr., at 171 (responding to question about whether Nabors told him not to speak to his children about Equihome refinancing, "[n]o, he didn't mention that."))  Instead, Leff relies on the assertion of his son, Kenneth Leff, that his father told him Equihome's agent used such "scare tactics".  (Pl. Br., at 17; Coffey Suppl. Cert., Ex. B, Kenneth Leff Dep. Tr., at 85-88 (explaining that although his father testified that Equihome never told him not to speak to his children about the refinance or that he might be thrown out on the street if he kept the reverse mortgage, "when my dad made the statements to me, he was in better physical and mental status than at his deposition").)

Kenneth Leff's testimony regarding what his father told him Equihome's agent said during their telephone conversation constitutes inadmissible hearsay, which this Court cannot consider.  Any "statement, other than one made by the declarant

while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is hearsay and is not admissible absent an applicable exception.  Fed.R.Evid. 801(c), 802.  Leff argues that Kenneth Leff's testimony about Nabors's "scare tactics" is admissible under the excited utterance exception to the general hearsay rule.  (Pl. Br., at 17.)  The requirements for an excited utterance are (1) a startling event, (2) a statement relating to the circumstances of the startling occasion, (3) a declarant who personally observed the events, and (4) a statement made before the declarant had time to reflect and fabricate.  United States v. Mitchel, 145 F.3d 572, 576 (3d Cir. 1998)  Thus, this exception has a temporal limitation.  Id.  A "lapse of time, and change of scene is relevant to determining the extent to which a statement is spontaneous or the result of deliberation."  United States v. Lawrence, 349 F.3d 109, 119 (3d Cir. 2003) (affirming district court ruling that too much time elapsed between shooting and subsequent statement at hospital on following day to qualify as excited utterance).

The startling event here was Kenneth Leff confronting his father about the Loan.  (Pl. Br., at 17.)  This Court finds, however, that Leff's statements regarding Nabors's alleged "scare tactics" do not relate to this confrontation, but instead relate to an entirely separate event, Leff's initial telephone call with Nabors.  The Court also concludes that there is no evidence

indicating that Leff was under the stress of excitement when he described the alleged "scare tactics" to his son. Specifically, no evidence is offered describing Leff's mannerisms and demeanor at the time he made the alleged statements. See Mitchel, 145 F.3d at 577 (concluding that there was no evidence indicating that author of note was under stress of excitement when he or she wrote it, and stating "[t]he assumption underlying the [excited utterance] exception . . . is that a person under the sway or excitement temporarily loses the capacity of reflection and thus produces statements free of fabrication").

This Court further concludes that the excited utterance exception is also inapplicable, if the startling event at issue is Leff's telephone call with Nabors regarding the refinancing of his reverse mortgage. Kenneth Leff confronted his father about the Loan more than two months after the closing. (Coffey Suppl. Cert., Ex. B, Kenneth Leff Dep. Tr., at 88). Accordingly, Leff's alleged statements about Nabors's "scare tactics", which followed this confrontation, were made well after he had sufficient time to reflect and possibly fabricate. Thus, this Court holds that Kenneth Leff's testimony about Equihome's statements to his father constitues inadmissible hearsay. Therefore, because Kenneth Leff's testimony is the only evidence in the record suggesting that Equihome engaged in deceptive telemarketing that

induced Leff to enter into the Loan, this Court will grant
Equihome's motion for summary judgment on Leff's TCFAA claim.

### C.   Leff's Negligent Misrepresentation Claim

All negligence torts in New Jersey require the plaintiff to
prove that the defendant breached a duty of care owed to the
plaintiff and the breach proximately caused damage to the
plaintiff. Highlands Ins. Co., v. Hobbs Group, LLC, 373 F.3d
347, 351 (3d Cir. 2004).  Accordingly, to state a claim for
negligent misrepresentation under New Jersey law, a plaintiff
must show that the defendant "negligently provided false
information and that plaintiff incurred damages proximately
caused by its reliance on that information." Id.; Stout-
Brunswick Assoc. LP v. Bankers Trust Co., No. 98-3206, 2004 U.S.
Dist. LEXIS 29426, at *14 (D.N.J. Dec. 23, 2004) ("To establish a
claim for negligent misrepresentation under New Jersey law,
plaintiffs must show that Defendant 'negligently made an
incorrect statement, upon which the plaintiff[s]' justifiably
relied.'").  The New Jersey Supreme Court has stated, "[t]here
must be knowledge, or reason to know, on the part of the speaker
that the information is desired for a serious purpose, that the
seeker of the information intends to rely upon it, and that . . .
the relying party will be injured in person or property." Stout-
Brunswick Assoc. LP, 2004 U.S. Dist. LEXIS 29426, at *14 (citing
H. Rosenblum, Inc. v. Adler, 461 A.2d 138, 143 (1983)).  The

22

defendant may be liable to any reasonably foreseeable recipient of the false information, if such recipient relies on the information.  Highlands Ins. Co., 373 F.3d at 351.

Equihome relies on the same arguments it asserted in opposing Leff's fraud claims in addressing Leff's negligent misrepresentation claim.  (Equihome Br., at 38.)  Moreover, Equihome argues that Leff's negligent misrepresentation claim is not only "unsupported by the undisputed facts, but, most importantly, there is no element of detrimental reliance here necessary to establish negligent misrepresentation."  Id.  In contrast, Leff argues that he has offered sufficient evidence to overcome summary judgment on his negligent misrepresentation claim.  (Pl. Br., at 20.)  Leff relies on the same arguments and evidence he set forth in addressing Equihome's motion for summary judgment on his fraud and TCFAA claims.  (Id.)  Thus, genuine disputes exist over whether Equihome made the alleged misrepresentations and whether Leff relied on the information contained therein to his detriment.  Accordingly, summary judgment is not appropriate on Leff's negligent misrepresentation claim.

### D.  Leff's Equal Credit Opportunity Act Claim

The Equal Credit Opportunity Act ("ECOA") makes it unlawful for a lender to discriminate against a credit applicant "on the basis of race, color, religion, national origin, sex or marital

23

status, or age" with respect to "any aspect of a credit
transaction".  15 U.S.C. § 1691(a)(1); 12 C.F.R. § 202.4(a).  To
establish a prima facie case under the ECOA, a plaintiff must
show that he or she (1) is a member of a protected class, (2)
applied for credit from the defendant, (3) was qualified for
credit, and (4) despite qualification, was denied credit.  In re
Chiang, 385 F.3d 256, 259 (3d Cir. 2004) (discussing prima facie
case under ECOA, and explaining that although Third Circuit has
not had occasion to decide whether Title VII burden-shifting
analysis set forth in McDonnell Douglas v. Green, 411 U.S. 792
(1973), should apply to ECOA claims, nearly every other circuit
court to consider that issue has held that it does).

     Leff asserts that circumstantial evidence shows that
Equihome violated the ECOA by targeting him on the basis of his
age, low income status, and frail condition.  (Pl. Br., at 18-
19.)  Specifically, Leff argues that Nabors's testimony and the
Loan file show that Equihome knew about his old age and "sub-par"
credit score at the time Leff entered into the Loan.  (Id. at
18.)  Leff also argues that Equihome did not consider "whether it
was appropriate to put [Leff], a 79-year old man at the time of
the application, into a 30-year mortgage."  (Id.)

     This Court concludes, however, that Leff has not presented
evidence substantiating his ECOA claim.  First, Leff was not
denied credit on a discriminatory basis, but instead Equihome

                              24

provided Leff with a thirty-year mortgage loan in the amount of
$223,000 and a $52,000 line of credit.  (Equihome Br., at 11-12.)
See Brown v. Interbay Funding, LLC, 417 F.Supp.2d 573, 578 (D.
Del. 2006) (holding that plaintiffs had not demonstrated that
they were denied credit based on discriminatory action because
plaintiffs were actually offered loans, but at rates less
favorable than originally proposed).  Second, Leff has not shown
that he was offered less favorable terms or otherwise treated
differently than other parties Equihome solicited or granted
loans.  The fact that Equihome knew Leff was elderly and had a
"sub-par" credit rating does not sufficiently prove that Equihome
treated Leff differently than others they solicited for mortgage
loans or refinancings.  See Wingert v. Credit Based Asset
Servicing & Securitization, LLC, No. 02-1973, 2004 U.S. Dist.
LEXIS 25186, at *28 n.14 (W.D. Pa. Aug. 26, 2004) (stating that
"there is no evidence that Plaintiffs were 'qualified' for the
terms of the originally proposed loan or that others were treated
more favorably in the loan process" and holding that Plaintiffs
failed to establish prima facie case of age discrimination under
ECOA).  Thus, although Leff has shown that he is a member of a
protected class and was qualified for a loan, he has not
established that he was denied credit or otherwise discriminated

25

against with respect to any aspect of the Loan.  Therefore, Leff

has not established his prima facie case under the ECOA.[2]

_____

[2] In support of his ECOA claim, Leff cites <u>Wilson v. Toussie</u>
for the proposition that the ECOA applies when a lender
"discriminatorily grants credit to a protected person".  (Pl.
Br., at 18.)  260 F.Supp.2d 530, 540 (E.D.N.Y. 2003).  There, the
plaintiffs alleged that the defendants, residential home sellers,
implemented a policy to "covertly steer minority buyers to
purchase defective homes in predominantly minority neighborhoods
and away from predominantly white neighborhoods." <u>Wilson</u>, 260
F.Supp.2d at 533.  The plaintiffs further alleged that the
defendant sellers prepared false loan applications and lured
minority buyers into purchasing homes they could not afford that
(1) were overpriced and over-appraised, (2) had mortgage or
property taxes that were dramatically higher than represented,
(3) lacked promised amenities, (4) were defectively built, and
(5) were located in worse areas than represented. <u>Id.</u>  The
plaintiffs also brought claims against the mortgage brokers,
agents and banks holding the plaintiffs' mortgage loans alleging
that the notes underlying such loans were "grossly over-inflated"
due to the defendant sellers' conduct. <u>Id.</u> at 534.  In
addressing whether the plaintiffs' ECOA claim could withstand a
motion to dismiss, the district court determined that the plain
language of the ECOA "is not limited to those applicants who were
rejected." <u>Id.</u> at 541.  Thus, the court concluded that "the
grant of loans in a predatory manner is actionable under the
ECOA." <u>Id.</u> at 540.
     This Court agrees that the ECOA is not limited to rejected
applicants, but also applies to applicants who receive credit
with less favorable terms due to their membership in a protected
class.  Nevertheless, the <u>Wilson</u> court's holding does not obviate
the requirement that a plaintiff must demonstrate how he or she
was treated differently than others outside the protected class,
and thus, establish prima facie evidence of discrimination.
Although their loans were granted, the <u>Wilson</u> plaintiffs were
treated differently than white home buyers and mortgagees because
the homes they were offered were overpriced and defective and the
mortgage loans they received were "grossly over-inflated".  Leff,
however, has not alleged that Equihome solicited only elderly
borrowers for their mortgages or that he received less favorable
terms with respect to the Loan than Equihome's younger borrowers.
Instead, Leff simply relies on the fact that Equihome knew about
his age and sub-par credit rating prior to entering into the
Loan, but this is insufficient to establish prima facie evidence
of discrimination.

**III. Flagstar's Motion for Summary Judgment**

    **A.   Flagstar's Breach of Contract Claim Against Equihome**

      The Agreements between Flagstar and Equihome are governed by Michigan law.  (Flagstar Br., at 5.)  Under Michigan law, the initial question of whether a contract is ambiguous is a question of law for the Court.  Holmes v. Artists Rights Enforcement Corp., 148 Fed.Appx. 252, 257 (6th Cir. 2005).  If the Court determines that the contract's language is clear, then the contract's interpretation is also a question of law.  Id. However, if the contract's language is unclear or susceptible to multiple meanings, then the contract's interpretation is a question of fact.  Id.

      An undefined term within a contract is not automatically considered ambiguous.  Id.  Instead, the Court will simply interpret such term in accordance with its commonly used meaning. Id. (concluding that term "proximate result" is not ambiguous when given its definite legal meaning); Twichel v. MIC Gen. Ins. Corp., 676 N.W.2d 616, 622 (Mich. 2004) (applying dictionary definition to undefined term, "ownership", in insurance policy). However, a contract term is considered ambiguous "when its provisions are capable of conflicting interpretations."  Holmes, 148 Fed.Appx. at 257; AGK Holdings, Inc. v. Essex Ins. Co., 142 Fed.Appx. 889, 891 (6th Cir. 2005) (unpublished) (explaining that an insurance policy term is ambiguous if "its words may

27

reasonably be understood in different ways").  The Court must view the contract as a whole and give meaning to all its terms. AGK Holdings, Inc., 142 Fed.Appx. at 891.  Further, in interpreting ambiguous terms, the fact-finder may rely on extrinsic evidence including, the parties' conduct, statements of the parties' representatives, and past practices.  Id.; Klapp v. United Ins. Group Agency, Inc., 663 N.W.2d 447, 454 (Mich. 2003). "Thus, the fact finder must interpret the [ambiguous] contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning."  Klapp, 663 N.W.2d at 469.

The Agreements require Equihome "to indemnify and hold harmless Flagstar" for all losses, liabilities, and claims arising out of, resulting from, or relating to Equihome's breach of any covenant, representation, or warranty contained in the Agreements.  (Flagstar's Statement of Facts, at ¶ 7)  Further, the Agreements require Equihome to immediately repurchase any mortgage loan sold to Flagstar if Flagstar, inter alia, reveals "any evidence of fraud" in connection with the origination or closing of a mortgage loan, or "is required to repurchase" a mortgage loan from a third party.  (Id.)  Flagstar argues that it "has revealed through discovery in this matter undisputed facts demonstrating not only 'evidence of fraud' under the Agreements, but outright fraud in the origination and closing of the Leff

28

Loan by the borrower, Leff, and by Equihome." (Flagstar Br., at 9.) For example, Flagstar argues that fraud occurred in connection with the Loan because (1) at least one of the closing documents Equihome prepared contains a forgery of Leff's signature, (2) Leff's income amount on his mortgage loan application with Equihome is false, and (3) Leff was actually not income-eligible for the loan program for which Equihome submitted his loan application. (Id. at 9, 12.) Accordingly, Flagstar contends that it has revealed "evidence of fraud" in the origination of the Loan, and thus, Equihome has breached the Agreements by refusing to defend and indemnify Flagstar and repurchase the Loan. (Id. at 9.) Flagstar also contends that Equihome breached the Agreements by failing to repurchase the Loan because Flagstar has shown that it was "required to repurchase" the Loan from First Horizon. (Id. at 12.)

This Court finds that Flagstar has not sufficiently demonstrated that it is entitled to summary judgment on its claim that Equihome breached the Agreements' repurchase provisions. Flagstar has not cited any law explaining what is meant by either "evidence of fraud" or "required to repurchase". Further, this Court's own research did not reveal any case law suggesting how these terms should be interpreted. Applying the common meanings associated with these terms reveals that they are susceptible to more than one reasonable interpretation. See Holmes, 148

Fed.Appx. at 257; AGK Holdings, Inc., 142 Fed.Appx. at 891.

"Evidence of fraud", for example, could mean, among other things,

a judicial determination that fraud has occurred, commencement of

an action alleging fraud, or facts that would lead a reasonably

prudent person to deduce that fraud has occurred.  Thus, because

this Court concludes that "evidence of fraud" is an ambiguous

term, it cannot hold that Leff's allegations definitively

constitute "evidence of fraud", particularly when Equihome denies

that any fraud occurred in connection with the origination and

closing of the Loan.

The phrase "required to repurchase", as it is used in this

context, is also ambiguous.  Flagstar states that "pursuant to a

separate agreement between Flagstar and First Horizon, Flagstar

was required to repurchase the Leff Loan from First Horizon for

reasons involving the origination and closing of the Leff Loan."

(Flagstar Br., at 12.)  In support of its assertion that it was

"required to repurchase" the Loan from First Horizon, Flagstar

relies only on the fact that it did repurchase the Loan following

receipt of a demand from First Horizon.  However, Flagstar has

not referred to any specific provision or ground contained in the

underlying agreement between it and First Horizon, which formed

the basis of its obligation to repurchase the Loan from First

Horizon.  Nor has Flagstar shown that the agreement between it

and First Horizon required it to repurchase a loan solely upon

30

receipt of a demand citing "Broker Misrep" and nothing more.  At
a minimum, "is required to repurchase" requires a demonstrated
contractual obligation between Flagstar and First Horizon, and
Flagstar cannot prove that such obligation exists by simply
showing that it received a demand and proceeded to repurchase.
"Is required to" is not necessarily synonymous with "is demanded
to" in this context.  Accordingly, we cannot say as a matter of
law that Flagstar was "required to repurchase" the Loan from
First Horizon.  Indeed, based on the minimal evidence in the
record, a trier of fact also would not be able to determine
whether Flagstar was "required to repurchase" the Loan.

Flagstar also has not shown that Equihome breached the
Agreements by failing to indemnify it.  Flagstar asserts that the
facts "undisputedly reveal evidence of fraud on the part of the
borrower Leff (if not by Equihome employee Nabors) with respect
to Leff's loan application to Equihome and Leff's and Equihome's
intention that Flagstar rely on such fraudulent evidence."  (Id.
at 11.)  In contrast, Equihome argues that the evidence shows
that it "committed no fraud, made no material misrepresentations,
and fully discharged its duties and obligations to its
underwriter Flagstar Bank in closing the loan."  (Equihome Reply
Br., at 14.)  Based on the evidence presented by the parties in
this motion, we find that genuine issues of material fact exist
as to whether Equihome breached any of the representations or

31

warranties contained in the Agreements, including its warranties
that (1) the Loan was valid, genuine, and duly executed, (2)
Equihome was in full compliance with all requirements of "Fannie
Mae, Freddie Mac, Ginnie Mae, FHA and VA" in submitting the Loan
to Flagstar, (3) Equihome had no knowledge of any conditions that
would make the Loan an unacceptable investment, cause the Loan to
become delinquent, or adversely affect the value or marketability
of the Loan, and (4) the Loan is not a "High Cost Loan" or
"predatory loan". (See Daly Aff., Ex. A, Correspondent Lending
Agmt., at ¶¶ 3.1(a), (j), (k), (l), (s); Daly Aff., Ex. B,
Wholesale Lending Broker Agmt., at ¶¶ 3.1(a), (j), (k), (l),
(s).)  Moreover, as previously discussed, Flagstar has not
adduced sufficient evidence to demonstrate that Equihome breached
its repurchase obligations under the Agreements.  Therefore,
because this Court concludes that genuine issues of material fact
exist with respect to whether Equihome breached the Agreements'
repurchase provisions or representations and warranties, this
Court also cannot conclude as a matter of law that Equihome has
breached the Agreements by failing to defend and indemnify
Flagstar in connection with this action.  Thus, this Court will
deny Flagstar's motion for summary judgment on its breach of
contract claim.

**B.   Flagstar's Fraud Claim Against Equihome**

The elements of a claim for common law fraud under New Jersey law were discussed <u>supra</u>.[3]  Flagstar contends that Equihome's representative, Nabors, was "complicit" in Leff's misrepresentations on his loan application about his income and liabilities.  (Flagstar Br., at 21.)  Specifically, Flagstar contends that Leff's deposition testimony indicates that both he and Nabors knew that Leff's statements regarding his income were false, but Equihome nevertheless adopted these misrepresentations when it recommended Leff for a loan program.  (<u>Id.</u>)  Flagstar also alleges that one of the closing documents was forged, and this forgery can only be attributed to Equihome because it prepared the closing documents.  (<u>Id.</u> at 21-22.)

Flagstar, however, has not offered any evidence actually showing that Equihome knew Leff's income was incorrect on the loan application, or that Equihome forged a closing document.  Instead, Flagstar relies on (1) Leff's allegations in the complaint, and (2) inferences drawn from Leff's testimony that when Nabors explained that Leff would have a better chance of obtaining a loan if his income was near ten thousand dollars, Leff responded, "do whatever you have to do."  (Flagstar Br., at 21; Letcher Decl., Ex. B., Leff Dep. Tr., at 159.).  Thus,

---

[3] Both Flagstar and Equihome apply New Jersey law with respect to Flagstar's common law fraud claim.

viewing the evidence in the light most favorable to Equihome, the Court concludes that genuine issues of material fact exist regarding whether Equihome knew or believed Leff's income on the mortgage loan application was false, whether Equihome forged a closing document, and whether Flagstar relied on these alleged misrepresentations in purchasing the Loan.  (<u>See</u> Equihome Reply Br., at 20 (claiming that there is no evidence of fraud in connection with Leff's Loan, but instead, "evidence demonstrates that Equihome followed the guidelines set forth in Flagstar's Underwriting Program and that Flagstar approved the closing of the mortgage transaction")).

Flagstar argues, in the alternative, that Equihome is liable under a theory of equitable fraud.  (Flagstar Br., at 22.)  Under New Jersey law, to establish a claim for equitable fraud the plaintiff must show (1) the defendant made a material misrepresentation of a presently existing or past fact, (2) the defendant intended for the plaintiff to rely on the misrepresentation, and (3) the plaintiff detrimentally relied on the misrepresentation.  <u>CSR Ltd. v. Rinker Materials Corp.</u>, No. 95-2947, 2005 U.S. Dist. LEXIS 29319, at *62 (D.N.J. Nov. 21, 2005) (applying equitable fraud doctrine to claim for rescission of insurance policy).  Flagstar seeks monetary damages with respect to its fraud claim.  However, fraud is considered legal in nature when the party asserting it seeks money damages.  (<u>See</u>

Flagstar's Amended Cross claims, at 7.)  <u>Marsellis-Warner Corp.</u>
<u>v. Rabens</u>, 51 F.Supp.2d 508, 521 (D.N.J. 1999).  Nevertheless,
assuming arguendo that Flagstar seeks rescission, its motion for
summary judgment still must be denied because, as previously
stated, genuine issues of material fact exist with respect to
whether Equihome made any material misrepresentations in
connection with the Loan and whether Flagstar relied on these
misrepresentations to its detriment.

**C.   Equihome's Cross Claims against Flagstar**

Equihome asserts claims for contribution and indemnification
against Flagstar.  (Equihome's Answer to Amended Compl., at 28-
29.)  Under New Jersey law, the prerequisites for contribution
are (1) entry of a judgment or verdict, (2) a determination of
damages, and (3) the existence of non-settling defendants.
<u>Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul,</u>
<u>L.L.P.</u>, 243 F.Supp.2d 145, 157 (D. Del. 2003).  Moreover, the New
Jersey Joint Tortfeasor Contribution Act provides, in relevant
part:

> [w]here injury or damage is suffered by any person as a
> result of the wrongful act, neglect or default of joint
> tortfeasors, and the person so suffering injury or
> damage recovers a money judgment or judgments for such
> injury or damage against one or more of the joint
> tortfeasors whether in whole or in part, he shall be
> entitled to recover contribution from the other joint
> tortfeasor.

N.J.S.A. § 2A:53A-3.  However, a settlement between the plaintiff

and one joint tortfeasor bars any action for contribution against
the settling tortfeasor.  Rottlund Homes of N.J., Inc., 243
F.Supp.2d at 157; Araps v. DeBaggis (In re DeBaggis), 247 B.R.
383, 393 (Bankr. D.N.J. 1999) (citing cases stating that
nonsettling defendant cannot assert contribution claims against
settling defendant); see Young v. Latta, 123 N.J. 584, 591 (1991)
(noting that New Jersey appellate division has explained that
courts should dismiss non-settler's cross claim for contribution
against settler as matter of law, but non-settling defendant will
get credit towards judgment for amount of settler's liability).
Accordingly, because Leff dismissed all of his claims against
Flagstar pursuant to a voluntary stipulation of dismissal,
Equihome cannot seek contribution from Flagstar in this action.
Therefore, this Court will grant the part of Flagstar's motion
for summary judgment on Equihome's contribution claim.

     This Court will also grant the part of Flagstar's motion for
summary judgment on Equihome's indemnification claim.  "One who
is primarily at fault may not obtain indemnity from another
tortfeasor."  Promaulayko v. Johns Manville Sales Corp., 562 A.2d
202, 205 (N.J. 1989); see Ronson v. Talesnick, 33 F.Supp.2d 347,
357 (D.N.J. 1999) (explaining that common law indemnification is
available under New Jersey law only to person who is not at fault
but has become responsible in tort for another's conduct).
Equihome's indemnification claim states, "if it is determined

                                36

<u>that Equihome is liable</u>, any liability or negligence was secondary, vicarious, and imputed", and thus, Equihome demands both statutory and common law indemnification from Flagstar. (Equihome's Answer to Amended Compl., at 29 (emphasis added).) No statutory rights to indemnification apply in this case. Further, Equihome allegedly committed the acts, omissions, and misrepresentations underlying Leff's claims.  Equihome has provided no evidence that its acts or omissions can be imputed to Flagstar in any way.  The fact that Flagstar underwrote the Loan does not create a sufficient relationship between the parties for vicarious liability.  Thus, Equihome will not be found liable in this action based on Flagstar's conduct.  This is particularly true considering Leff voluntarily dismissed his claims against Flagstar.  Therefore, this Court will grant Flagstar's motion for summary judgment with respect to Equihome's indemnification claim.

**IV.  Flagstar's Motion to Impose Sanctions**

    **A.   Sanctions in General**

    "[D]istrict courts have broad authority to preserve and protect their essential functions.  To ensure that district courts have tools available to protect their truth-seeking process, the Federal Rules of Civil Procedure allow district courts to sanction parties who fail to meet minimum standards of conduct in many different contexts."  <u>Rep. of Phil. v.</u>

<u>Westinghouse Elec. Corp.</u>, 43 F.3d 65, 73 (3d Cir. 1994) (citing
(1) Rule 11 (groundless pleadings and other papers), (2) Rule
16(f) (failing to abide by pretrial orders), (3) Rules 26(g),
30(g), 37(d), and 37(g) (discovery abuses), (4) Rule 41(b)
(involuntary dismissal for failing to prosecute, follow rules, or
obey court orders), (5) Rule 45(f) (disobeying subpoena), and (6)
Rule 56(g) (providing affidavit at summary judgment in bad faith
or for delay)).  District courts also have statutory authority to
"police misconduct".  <u>Id.</u> (citing 18 U.S.C. § 401 (contempt
power) and Section 1927 (punishing attorneys who vexatiously
multiply proceedings)).

      These formal rules and legislative dictates, however, do not
exhaust district courts' power to control misbehaving litigants.
<u>Id.</u>  District courts have inherent authority to impose sanctions
upon those who abuse the judicial process.  <u>Id.</u> (citing <u>Chambers</u>
<u>v. NASCO, Inc.</u>, 501 U.S. 32, 43 (1991) ("It has long been
understood that 'certain implied powers must necessarily result
to our Courts of justice from the nature of their
institution'")).  Thus, courts are "universally acknowledged to
be vested, by their very creation, with power to impose silence,
respect, and decorum, in their presence and submission to their
lawful mandates. . . .  These powers are 'governed not by rule or
statute but by the control necessarily vested in courts to manage
their own affairs so as to achieve the orderly and expeditious

38

disposition of cases.'"  Chambers, 501 U.S. at 43.  Here, Flagstar
seeks the imposition of sanctions on Equihome and its counsel,
Gregory Coffey, pursuant to Section 1927, Rule 11, and the
Court's inherent power.  (Flagstar Sanctions Br., at 1.)

**B.   Sanctions Under Section 1927**

"Any attorney or other person admitted to conduct cases in
any court of the United States or any Territory thereof who so
multiplies the proceedings in any case unreasonably and
vexatiously may be required by the court to satisfy personally
the excess costs, expenses, and attorneys' fees reasonably
incurred because of such conduct."  28 U.S.C. § 1927.  This
section only authorizes imposition of sanctions on counsel, not
parties.  Dashner v. Riedy, No. 04-4071, 2006 U.S. App. LEXIS
18253, at *18 (3d Cir. July 19, 2006).  The Court must find
willful bad faith on the part of the offending attorney before it
can impose sanctions under Section 1927.  Hackman v. Valley Fair,
932 F.2d 239, 242 (3d Cir. 1991).  Thus, "[t]o justify the
imposition of excess costs of litigation upon an attorney his
conduct must be of an egregious nature, stamped by bad faith that
is violative of recognized standards of conduct of litigations."
Id.  Neither lack of advocacy skills or submission of a weak
argument constitute bad faith sufficient to invoke Section 1927.
Id. at 243.

## C.    Sanctions Under Rule 11

Rule 11 authorizes a district court to impose sanctions on a party, the party's counsel, or both, for presenting to the Court a pleading, written motion, or other paper (1) for any improper purpose, (2) containing claims, defenses, or other legal contentions that are not warranted by existing law or a nonfrivolous argument for extension or modification of existing law, or (3) containing factual allegations or denials of factual allegations that lack evidentiary support.  Fed.R.Civ.P. 11(b)-(c); see Bus. Guides v. Chromatic Commc'ns Ent., 498 U.S. 533, 545-54 (1991) (concluding that Rule 11 imposes same requirement — objectively reasonable prefiling inquiry — on client who signs papers filed with court as it imposes on attorney who does so). "Rule 11 targets abuse, making sanctions appropriate only if 'the filing of the complaint [or other paper] constituted abusive litigation or misuse of the court's process.'"  Simmerman v. Corino, 27 F.3d 58, 62 (3d Cir. 1994).  To comply with Rule 11, counsel must conduct "a reasonable investigation of the facts and a normally competent level of legal research to support presentation."  Id.; Slater v. Skyhawk Transp., 187 F.R.D. 185, 199 (D.N.J. 1999) (explaining that Rule 11 requires at a minimum that the document signer conduct a reasonable inquiry or face sanctions).

40

Rule 11 sanctions are only imposed in exceptional circumstances in which the claim or motion is patently unmeritorious or frivolous.  Ford Motor Co. v. Summit Motor Prods., 930 F.2d 277, 289 (3d Cir. 1991).  The Court, to find a Rule 11 violation, need not conclude that a party or an attorney acted in bad faith.  Martin v. Brown, 63 F.3d 1253, 1264 (3d Cir. 1995) (noting that bad faith is not required under Rule 11 standard).  Instead, the Court employs "an objective standard of reasonableness under the circumstances" in determining whether to impose Rule 11 sanctions.  Slater, 187 F.R.D. at 199.  "Reasonableness [is] defined as an 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact."  Ford Motor Co., 930 F.2d at 289.  Therefore, in considering a motion to impose sanctions under Rule 11, the Court must determine that (1) the claims are objectively frivolous, and (2) the person who signed the pleadings or other papers should have been aware that they were frivolous.  Baker v. Alderman, 158 F.3d 516, 524 (11th Cir. 1998).

An appropriate sanction for a Rule 11 violation is one which "is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated."  Carlino v. Gloucester City High Sch., 57 F.Supp.2d 1, 39 (D.N.J. 1999).  Such a sanction may include nonmonetary directives, payment of a penalty

to the court, or an order directing payment of the movant's
attorneys fees.  <u>Id.</u>  The Court must consider the particular
facts of the case and impose the least severe sanction that would
further the purposes of Rule 11.  <u>Id.</u>

    **D.**   **The Court's Inherent Power to Impose Sanctions**

    "Although a court retains the inherent right to sanction
when rules of court or statutes also provide a vehicle for
sanctioning misconduct, resort to these inherent powers is not
preferred when other remedies are available."  <u>In re Prudential</u>
<u>Ins. Co. Am. Sales Prac. Litig. Agent Actions</u>, 278 F.3d 175, 189
(3d Cir. 2002).  Moreover, "[a]lthough the Court need not
'exhaust all other sanctioning mechanisms prior to resorting to
its inherent power', the court must explain why it has chosen any
particular sanction from the range of alternatives it has
identified."  <u>Rep. of Phil.</u>, 43 F.3d at 74 (internal citations
omitted).

    Courts may use their inherent power to impose sanctions on
either litigants or attorneys, to regulate their docket, to
promote judicial efficiency, and to deter abuse of the judicial
process.  <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 505 (3d Cir.
1991).  However, this inherent power must be exercised with
restraint and discretion.  <u>Moss v. McDonald's Corp.</u>, No. 03-5000,
2006 U.S. Dist. LEXIS 13936, at *15 (D.N.J. Mar. 13, 2006).
Further, the Court must determine whether the party acted in bad

faith.  Id. at *16.  Thus, the Court's inherent power to sanction
should be reserved for cases in which the conduct of the litigant
or attorney is egregious and no other basis for sanctions exists.
Id.

> E.  **Appropriateness of Sanctions Here**
>
> 1.  **Section 1927**

Flagstar asserts that Equihome has engaged in a course of
conduct that has multiplied the proceedings in this matter by
"thwarting the progress of discovery and court-ordered
proceedings in this matter, failing to defend, indemnify and hold
Flagstar harmless pursuant to its clear contractual obligations,
and asserting baseless cross-claims against Flagstar".  (Flagstar
Sanctions Br., at 16.)  Flagstar further asserts that Equihome's
counsel knew that it had no defense to Flagstar's cross claims
and that Equihome is obligated to indemnify Flagstar with respect
to this action.  (Id. at 17.)  Thus, Flagstar argues that "there
is little question that Equihome's conduct is unreasonable,
intentional, vexatious and in bad faith", and therefore, Flagstar
is entitled to an award of its counsel fees and costs in
defending this matter pursuant to Section 1927.  (Id. at 17-18.)

Flagstar's request for the Court to impose sanctions
pursuant to Section 1927 against Equihome's counsel, Coffey, is
premised on its assertion that Equihome breached its obligations
under the Agreements.  However, as discussed supra, genuine

issues of material fact exist with respect to whether Equihome
breached either the repurchase provisions or the representations
and warranties contained in the Agreements.  Further, the
Agreements' repurchase provisions contain ambiguous terms, and
thus, it is unclear whether Equihome is in fact obligated to
repurchase the Leff Loan.  Accordingly, this Court finds that
Equihome's counsel did not act egregiously or in bad faith by
failing to convince his client to repurchase or indemnify
Flagstar.  See Hackman, 932 F.2d at 242.  Similarly, this Court
does not believe that imposition of sanctions is justified simply
because Coffey filed cross claims, on behalf of Equihome, against
Flagstar, which might be characterized as "weak".  See id. at 243
(noting that submission of a weak argument does not constitute
bad faith sufficient to invoke Section 1927).

### 2.  Rule 11

Flagstar posits that Equihome has not filed an answer to its
amended cross claims because Equihome is reluctant to sign, file,
or submit a pleading under Rule 11 when it does not have any
defenses to Flagstar's cross claims.  (Flagstar Sanctions Br., at
20.)  Flagstar argues that Coffey "has either failed to read the
Agreements or completely disregarded their express, unambiguous
language."  (Id.)  It also argues that Equihome is estopped from
denying that there is evidence of fraud with respect to the Leff
Loan, and Equihome has no reasonable basis for denying the

44

allegations of its cross claims.  (<u>Id.</u> at 21.)  Thus, Flagstar
states, "any reply - save an admission - by Equihome to
Flagstar's Amended Cross-Claims is merely vexatious and subject
to Sanction under Rule 11."  (<u>Id.</u>)

    This Court rejects Flagstar's assertion that Equihome's
defenses to Flagstar's cross claims have no legal or factual
merit.  (<u>See</u> <u>id.</u> at 2.)  Like its request for sanctions under
Section 1927, Flagstar's request for sanctions against both
Equihome and Coffey pursuant to Rule 11 is premised on its
argument that Equihome breached the Agreements' clear and
unequivocal terms.  However, this Court has already determined
that the relevant terms in the Agreements' repurchase provisions,
"evidence of fraud" and "is required to repurchase", are
susceptible to more than one reasonable interpretation.  Thus,
Flagstar has not shown that either Equihome or Coffey has
asserted "patently unmeritorious or frivolous" defenses to its
cross claims.  <u>See</u> <u>Ford Motor Co.,</u> 930 F.2d at 289.  Further,
Rule 11 only imposes sanctions on an attorney or litigant who
signs and files a document or pleading with the Court, and
Equihome did not file any papers with the Court setting forth its
defenses to Flagstar's cross claims prior to Flagstar moving to
impose sanctions.  Therefore, this Court concludes that
imposition of Rule 11 sanctions is not reasonable here.  <u>See</u>
<u>Slater</u>, 187 F.R.D. at 199.

### 3.    The Court's Inherent Authority to Impose Sanctions

This Court also will not invoke its inherent power to impose sanctions at this time because, for the reasons stated <u>supra</u>, it does not believe that either Equihome or Coffey acted in bad faith or engaged in conduct that can be characterized as egregious.  See <u>Moss</u>, 2006 U.S. Dist. LEXIS 13936, at *16.

### CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) dismiss counts two (New Jersey Home Ownership Security Act), three (Real Estate Settlement Procedures Act), four (Truth in Lending Act), and seven (Breach of Fiduciary Duty) of the complaint as withdrawn, (2) deny Equihome's motion for summary judgment with respect to count one (common law fraud), count five (New Jersey Consumer Fraud Act), and count six (negligent misrepresentation), of the complaint, (3) grant Equihome's motion for summary judgment with respect to count nine (Equal Credit Opportunity Act) and count ten (Telemarketing Consumer Fraud & Abuse Prevention Act) of the complaint, (4) deny Flagstar's motion for summary judgment with respect to its cross claims against Equihome, (5) grant Flagstar's motion for summary judgment with respect to Equihome's cross claims against it, and (6) deny Flagstar's motion to impose sanctions against Equihome and its counsel.

46

The Court acknowledges that no federal claims remain in this action.  Nevertheless, the Court, in the exercise of its discretion, shall retain this action rather than remanding to state court.  The Court will issue an appropriate order and judgment.[4]

s/ Mary L. Cooper

**MARY L. COOPER**
United States District Judge

---

[4] The parties are directed to confer in an effort to resolve any disagreement regarding the default that is currently docketed against Equihome.  (Unnumbered dkt. entry after dkt. entry no. 92.)  If they are unable to resolve that issue, they may contact the chambers of the Magistrate Judge or, if necessary, engage in motion practice.