## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILLARD LEFF,<br><br>            Plaintiff,<br><br>v.<br><br>FIRST HORIZON HOME LOAN CORPORATION, EQUIHOME MORTGAGE CORPORATION, FLAGSTAR BANK, and BANCTEL.COM, LLC,<br><br>            Defendants. | Docket No.  05-3648 (GEB-JJH)<br><br>Civil Action |

---

## PLAINTIFF'S BRIEF OPPOSING DEFENDANT EQUIHOME'S MOTIONS FOR A NEW TRIAL, REMITTITUR, EXCLUSION OF EVIDENCE, AND AN UNSECURED STAY OF EXECUTION

---

PAUL CASTRONOVO, LLC
Attorney & Counsellor at Law
90 Washington Valley Road
Bedminster, New Jersey 07921
(908) 719-8888
Attorney for Plaintiff

On the Brief:

            Paul Castronovo

## TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                            1

SUMMARY OF THE CASE                                                             3

STATEMENT OF FACTS                                                             4

LEGAL ARGUMENT                                                                10

POINT I

THE TESTIMONIAL AND DOCUMENTARY EVIDENCE SHOW THAT THE
JURY'S VERDICT ON BOTH LIABILITY AND DAMAGES WAS REASONABLE

POINT II                                                                      18

THE LEFF-BERGIDA TAPE RECORDED CONVERSATIONS ARE
ADMISSIBLE BECAUSE KEN LEFF LEGALLY RECORDED THEM

POINT III                                                                     21

THE COURT PROPERLY ADMITTED PLAINTIFF'S VIDEOTAPED
DEPOSITION TESTIMONY BECAUSE DEFENDANT ADMITS HE WAS
UNABLE TO APPEAR AND IT CANNOT SHOW UNDUE PREJUDICE

POINT IV                                                                      23

DEFENDANT IS NOT ENTITLED TO THE EXTRAORDINARY REMEDY OF AN
UNSECURED STAY BECAUSE IT HAS DEMONSTRATED NEITHER THE
MEANS NOR THE WILL TO GUARANTEE PAYMENT OF THE JUDGMENT

POINT V                                                                       27

PLAINTIFF IS ENTITLED TO HAVE DEFENDANT POST A COSTS BOND TO
GUARANTEE PAYMENT OF ALL POST-JUDGMENT INTEREST, APPEAL
COSTS, AND ATTORNEYS' FEES

CONCLUSION                                                                    28

## PRELIMINARY STATEMENT

After five days of trial in which the jury considered hundreds of pages of documents and heard the testimony of seven witnesses, the jury on May 30, 2007 returned a verdict of $220,000 for Plaintiff which the Court then trebled. Simply put, the evidence at trial showed that Defendant Equihome engaged in an unconscionable commercial practice in violation of the Consumer Fraud Act due to the following documentary evidence:

| Before Equihome | After Equihome |
| --- | --- |
| $76,123 line of credit remaining on Plaintiff's reverse mortgage | $52,631 with no additional line of credit |
| $0 monthly mortgage payment | $1,319 monthly mortgage payment against monthly income of $964 |
| Secure in his home for life | Foreclosure proceedings |

As this chart shows, the jury heard ample evidence to support its verdict. Moreover, Equihome's motion for a new trial completely ignores the testimony of the seven witnesses at trial by failing to cite to the trial transcripts. These two points defeat Defendant Equihome's motion for a new trial. Similarly, the jury awarded Plaintiff the amount of the predatory mortgage so he could pay it off and avert foreclosure. Compensating Plaintiff for this ascertainable loss so he may keep his home is a reasonable award that conforms to the evidence. Defendant's second-guessing of the jury cannot trump the record evidence.

Equihome's continued objection to the Leff-Bergida tape recordings also fails. As Plaintiff successfully argued on Defendant's motion *in limine*, New Jersey law applies to

the tapes and the tapes were legally acquired under New Jersey law. As such, the Court did not abuse its discretion in admitting those tapes at trial.

Finally, Defendant Equihome has failed to prove that it is entitled to an unsecured stay of execution on the judgment. Quite simply, it has demonstrated neither the financial means to secure the judgment nor the will to pay it. Public records show that Equihome has failed to pay two small outstanding judgments against it and it has refused to honor its mid-trial settlement agreement with Flagstar Bank. For these reasons, Equihome is not entitled to the extraordinary remedy of an unsecured stay. Plaintiff asks the Court to require Equihome to either post a supersedeas bond through an A-rated surety for the full amount or to deposit $780,787.33 into Court. Moreover, given Equihome's track record of non-payment, Plaintiff asks the Court to require it to post a costs bond in addition to the supersedeas bond.

Consequently, Equihome is not entitled to any of the relief sought and its motions should be denied.

## SUMMARY OF THE CASE

Here, Plaintiff submitted evidence to the jury showing that:

- Equihome solicited a loan that Plaintiff did not want;

- Plaintiff suffered net harm due to the loan that eventually led to his default and a pending foreclosure suit by the current mortgagee, Flagstar Bank;

- Equihome misrepresented Plaintiff's income on the loan application and lied to Plaintiff as to the status of his existing reverse mortgage;

- Equihome preyed on Plaintiff's old age and ill health in forcing the loan on him; and

- Equihome's misrepresentations and unconscionable practices violate the New Jersey Consumer Fraud Act.

## STATEMENT OF FACTS

Since Defendant Equihome failed to order trial transcripts, Plaintiff will rely on the record available from the trial: the trial exhibits, Plaintiff's testimony, and the transcripts of the tape recorded conversations between Ken Leff and Jeffrey Bergida.   In the interest of preserving the Court's time, Plaintiff will merely bullet-point the relevant evidence adduced at trial:

- Plaintiff was born in 1924.   *See* Uniform Residential Loan Application (showing Plaintiff's date of birth), Plaintiff's Trial Exhibit No. 5, Castronovo Aff., Exhibit A.

- On October 13, 2003, Plaintiff's doctor diagnosed him with "mild dementia" and recommended the drug Aricept to combat it.   *See* Treatment Notes of Dr. Jerrold Gertzman, Plaintiff's Trial Exhibit No. 59, Castronovo Aff., Exhibit B.

- Under prescription, Plaintiff takes oxygen to breath and nitroglerin for his heart.   *See* Plaintiff's Dep. at 11:3-25 and 261:4-24, Castronovo Aff., Exhibit C.

- Plaintiff also suffers from a host of other medical ailments, including "coronary artery disease, diabetes, hypertension, and obstructive sleep apnea[.]"   *See* Treatment Notes of Dr. Jerrold Gertzman, Castronovo Aff., Exhibit B.

- Plaintiff's main source of income is his $964 monthly Social Security check.   *See* Plaintiff's Dep. at 74:1-6, Castronovo Aff., Exhibit C.

- Plaintiff was "totally confused" about the mortgage refinance and "didn't understand half of them [the documents]" given to him that described the

4

transaction.  *See* Plaintiff's Dep. at 303:13 to 304:18, Castronovo Aff., Exhibit
C.

- When the predatory refinance closed, Plaintiff had a $76,123.20 line of credit
  remaining on his reverse mortgage with Household Senior Services and he
  was eligible to increase that amount on a yearly basis.  *See* Plaintiff's Dep. at
  205:19 to 207:25, Castronovo Aff., Exhibit C; Household Senior Services
  Account Statement, Plaintiff's Trial Exhibit No. 2, Castronovo Aff., Exhibit D.

- The reverse mortgage was for $290,400 and the payoff was $164,233.07
  leaving an unused balance of $126,166.93 (the difference with the line of
  credit being anticipated interest over the life of the loan).  *See* Plaintiff's Dep.
  at 277:2 to 279:14, Castronovo Aff., Exhibit C; Reverse Mortgage Payoff
  Letter, Plaintiff's Trial Exhibit No. 3, Castronovo Aff., Exhibit E.

- Defendant Equihome solicited Plaintiff by telephone to refinance his reverse
  mortgage into a 30-year conventional mortgage.  *See* Plaintiff's Dep. at 109:8
  to 111:2 and 117:2 to 119:21, Castronovo Aff., Exhibit C.

- Despite Equihome's contention that Plaintiff had good credit, Plaintiff's credit
  report noted that he had "serious delinquencies" on several credit accounts.
  *See* Credit Report, Plaintiff's Trial Exhibit No. 20, Castronovo Aff., Exhibit F.

- As a result, Nabors submitted Plaintiff's loan application to Option One, a
  mortgage underwriter, as a "sub prime" loan.  *See* Option One Submission,
  Plaintiff's Trial Exhibit No. 16, Castronovo Aff., Exhibit G.

- Option One raised a red flag on Plaintiff's mortgage application because most lenders will not allow a borrower to refinance a reverse mortgage. *See* Note from Option One, Plaintiff's Trial Exhibit No. 19, Castronovo Aff., Exhibit H.

- Equihome received a fee of $13,909.54 for the predatory refinance. *See* Closing Statement, Plaintiff's Trial Exhibit No. 47, Castronovo Aff., Exhibit I.

- Equihome misrepresented Plaintiff's income on the loan application as being $120,000 a year when he told them it was $10,000 a year. *See* Plaintiff's Dep. at 159:14 to 160:10, Castronovo Aff., Exhibit C; Loan Application, Plaintiff's Trial Exhibit No. 5, Castronovo Aff., Exhibit A.

- When the predatory refinance closed, Plaintiff realized that Equihome did not "come clean" about the refinance. *See* Plaintiff's Dep. at 286:9-13 and 288:8-23, Castronovo Aff., Exhibit C.

- The first purchaser of Plaintiff's mortgage, Flagstar Bank, demanded that Equihome repurchase the loan due to fraud in the application process. *See* Flagstar Repurchase Demand, Plaintiff's Trial Exhibit No. 58, Castronovo Aff., Exhibit J.

- The bank that bought the loan from Flagstar, First Horizon Home Loan, successfully demanded that Flagstar repurchase the loan due to "broker misrepresentation" and "probable income fraud" by Defendant Equihome. *See* First Horizon Repurchase Demand, Plaintiff's Trial Exhibit No. 58, Castronovo Aff., Exhibit J.

- Before the predatory refinance, Plaintiff's reverse mortgage payment was $0 per month and he had a remaining line of credit of $76,123 on his reverse

mortgage.  *See* Plaintiff's Dep. at 67:3-18 and 113:7 to 114:1; Household Senior Services Reverse Mortgage Statement, Plaintiff's Trial Exhibit No. 1, Castronovo Aff., Exhibit K.

- After the predatory refinance of his reverse mortgage, Plaintiff was obligated to pay $1,319.13 per month under the 30-year conventional mortgage and received only $52,631 in cash drawn from the equity in his home.  *See* Settlement Statement and Truth-In-Lending Disclosure Statement, Plaintiff's Trial Exhibit No. 33 and 45, Castronovo Aff., Exhibit L.

- Nabors knew during the application process that Plaintiff "has a reverse mortgage, [and] only pays when he wants."  *See* Nabors Application Notes, Plaintiff's Trial Exhibit No. 15, Castronovo Aff., Exhibit M.

- After Plaintiff "was talked out of the original reverse mortgage and then found that it really wasn't as advantageous to [him] monetarily, [he] contemplated getting a reverse mortgage again if that was possible."  *See* Plaintiff's Dep. at 204:6 to 205:5.  As a result of the refinance of his reverse mortgage into a 30-year conventional mortgage, Plaintiff testified that he got "the short end of the stick." *Id.* at 207:9-25 and 214:10 to 215:8.  In fact, Plaintiff never wanted to refinance his reverse mortgage into a 30-year conventional mortgage, but he was talked into it by Equihome. *Id.* at 272:12 to 273:4.

- The $1,319 monthly payment on the predatory mortgage exceeded Plaintiff's $964 monthly Social Security check – Plaintiff's main source of income.  *See* Plaintiff's Dep. at 74:1-9 and 40:21-23.  As a result, Plaintiff defaulted on the mortgage after only six months and the second purchaser of the mortgage

(First Horizon Home Loan) filed suit to foreclose on Plaintiff's home; First Horizon dropped the foreclosure suit after it learned there were contractual problems with the loan that it bought from Flagstar Bank.  *See* Getler E-mail, Plaintiff's Trial Exhibit No. 55 and 57, Castronovo Aff., Exhibit N.

- To payoff the $223,000 predatory mortgage, at the time of trial Plaintiff owed $272,176.10 and counting.  *See* Flagstar Letter, Plaintiff's Trial Exhibit No. 66 Castronovo Aff., Exhibit O.

- Plaintiff made $7,914 in payments on the predatory mortgage and he was charged $6,135.54 in closing costs on it.  *See* Plaintiff's Trial Exhibit No. 52 and 44, Castronovo Aff., Exhibit P.

- Jeffrey Bergida, Equihome's General Counsel, testified at deposition that each of his conversations with Ken Leff occurred in New Jersey while Bergida was conducting business for Equihome.  In three of Bergida's four conversations with Ken Leff, Bergida was "sitting in [his] office at Equihome in Bernardsville, New Jersey."  *See* Bergida Dep. at 42:7 to 44:14, Castronovo Aff., Exhibit Q.  The fourth conversation was on Bergida's cell phone in Bergida's car while traveling in New Jersey.  *Id.* These calls were recorded. *Id.* at 13:15-20.

- On the tape recordings, Bergida admitted that the refinance was predatory:

[L]ook if someone is in a reverse mortgage [like Plaintiff], they can't be benefited by getting out of it, that's it.  There isn't a tangible benefit, and certainly of taking a senior citizen out of a reverse mortgage, you can't do it and we won't do it.

. . .

8

I'm sure I know how these things go down, but the other thing is you're not allowed to discriminate against someone because they're elderly.  If an elderly person comes in, the strongest – the strongest argument you have by far is the New Jersey predatory lending law...You don't need to go passed the fact that under New Jersey refi[nance] law, you don't refi someone unless you're benefiting them.

*See* Telephone Calls Tr. at 53:24 to 54:5 and 76:23 to 77:10, Plaintiff's Trial

Exhibit No. 62, Castronovo Aff., Exhibit R.

- Bergida described the predatory refinance as "a sophisticated transaction anyway, so even if [Plaintiff] did have full faculties, it doesn't mean he grasped what he was doing." *Id.* at 11:12-22.  Bergida continued that Plaintiff was "set for life" with the reverse mortgage and "no one should have been disturbing that." *Id.* at 15:16 to 17:12.  By disturbing Plaintiff's situation with the predatory refinance, Bergida stated that "it's a lousy thing to do to an elderly person." *Id.* at 19:14-18.

## LEGAL ARGUMENT

### POINT I

### THE TESTIMONIAL AND DOCUMENTARY EVIDENCE SHOW THAT THE JURY'S VERDICT ON BOTH LIABILITY AND DAMAGES WAS REASONABLE

A new trial may be granted pursuant to *Rule* 59(a) of the Federal Rules of Civil Procedure.  But ordering a new trial is disfavored because "[s]uch an action effects a denigration of the jury system to the extent that new trials are granted the judge takes over...the prime function of the jury as the trier of fact." *DePuy Inc. v. Biomedical Eng. Trust*, 216 F. Supp.2d. 358, 377-78 (D.N.J. 2001) (citing *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1076 (3d Cir.1996)).

When a party, such as Defendant Equihome, seeks a new trial by contending that the verdict is against the weight of the evidence, the Court's "discretion is limited." *Id.* (citing *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993)); *see also Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 366 (3d Cir.1999).  Indeed, "new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the Court's] conscience." *Id.* [emphasis added] (citing *Greenleaf*, 174 F.3d at 366).

In considering a motion for new trial, the evidence must be viewed in the light most favorable to the party who prevailed at trial.  *Id.* (citing *Wagner v. Firestone Tire & Rubber Co.*, 890 F.2d 652, 656 (3d Cir.1989)).  To uphold the verdict, the "court need only determine that the record contains the minimum quantum of evidence from which a

jury might reasonably afford relief." *Id.* [emphasis added] (citing *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3d Cir.1980)).

At the outset, Defendant Equihome's motion for a new trial is deficient for the simple reason that it fails to cite any testimony offered at the trial. Defendant does not include any portion of the trial transcript in support of its motion. It relies solely upon the documents entered into evidence. Defendant's motion ignores the testimony of Plaintiff, Ken Leff, Barbara Leff-Croop, Linda Terrasi (Flagstar), Ralph Picarillo (Defendant's Chief Financial Officer), Steve Nabors (Defendant's loan officer), and Ray Caprio (Defendant's President and half-owner). Since Defendant bears the heavy burden of proving that the evidence is so scant as to deem the jury's verdict a manifest miscarriage of justice, it is not entitled to relief by relying on only half of the evidence admitted at trial.

As explained below, Defendant's motion also fails under the "minimum quantum of evidence" standard required to overturn the verdict and order a new trial.

## A.    The Jury Weighed Volumes of Evidence to Support its Verdict.

Predatory lending violates the New Jersey Consumer Fraud Act (CFA) as an "unconscionable commercial practice." *See* N.J.S.A. 56:8-2; *see also Associated Home Equity Services, Inc. v. Troup*, 343 N.J.Super. 254, 278 (App.Div. 2001). Loans are included in the CFA's definition of "merchandise." N.J.S.A. 56:8-1(a) and (c); *see also Lemelledo v. Beneficial Mgmt. Corp.*, 150 N.J. 255, 265 (1997).

*Associated Home Equity* is particularly instructive because it defines predatory lending and reversed the trial court's grant of summary judgment on the CFA claim at issue. In that case, a 74-year old woman entered into a loan secured by her home that

eventually led to her default and foreclosure proceedings. *See* 343 N.J.Super. at 263-64. The mortgage broker received a $2,325 fee for originating the loan – known in the industry as a "yield spread premium." *Id.* at 269. The broker did all the "leg work" on the loan application. *Id.* at 265. At the loan closing, the elderly borrower "was confused because of the number and complexity of the documents." *Id.* at 280.

In analyzing the elderly borrower's CFA claim, the Appellate Division noted that, "Predatory lending has been described as:

> 'a mismatch between the needs and the capacity of the borrower…In essence, the loan does not fit the borrower, either because the borrower's underlying needs for the loan are not being met or the terms of the loan are so disadvantageous to that particular borrower that there is <u>little likelihood that the borrower has the capability to repay the loan</u>.'"

*Id.* at 267 (emphasis added and citation omitted); *see also* "An Overview of the Predatory Mortgage Lending Process" by Elizabeth Renuart, *Housing Policy Debate*, Vol. 15, Issue 3 at 479-81 and 483, *Fannie Mae Foundation* 2004, www.fanniemaefoundation.org/programs/hpd/v15i3-index.shtml (defining predatory lending as loans with net harm to borrowers, loans solicited by brokers, broker falsification of income levels, and unaffordable loans based on home equity regardless of the borrower's ability to repay).

The *Associated Home Equity* Court emphasized that the "word 'unconscionable' must be interpreted liberally so as to effectuate the public purpose of the CFA." 343 N.J.Super. at 278 (citing *Kugler v. Romain*, 58 N.J. 522, 543 (1971)). The unconscionability clause requires a standard of conduct that exemplifies good faith, honesty in fact, and fair dealing. *Id.* The need for applying this standard "is most acute when the professional seller is seeking the trade of those most subject to exploitation –

12

the uneducated, the inexperienced and people of low incomes." *Id.* The determination of whether a practice is unconscionable is made on a case-by-case basis. *Id.*

Here, the jury considered evidence in Plaintiff's case that met the predatory lending criteria set forth by both *Associated Home Equity* and the Fannie Mae Foundation:

(1)    Like the borrower in *Associated Home Equity*, the jury saw from Plaintiff's testimony and his loan application that Plaintiff is elderly and low income while being "totally confused" by the loan's paperwork;

(2)    Similarly, the documentary evidence showed that Plaintiff's mortgage refinance was so onerous that his $964 monthly income from Social Security would never be enough to pay the $1,319 monthly payments which eventually led to his default and foreclosure proceedings;

(3)    Both Steve Nabors and Plaintiff testified at trial that Defendant Equihome solicited the loan from Plaintiff;

(4)    The documentary evidence and the testimony of Mr. Nabors demonstrated that Defendant Equihome received a princely yield spread premium of $13,909.54 for ten hours of work (six times the broker's fee in *Associated Home Equity*);

(5)    Again, both the documentary evidence and the testimony of Mr. Nabors illustrated for the jury that the mortgage refinance was largely based on Plaintiff's equity in his home without regard for his ability to make the monthly payments; and

(6)    As Defendant Equihome admitted through Bergida's tape-recorded conversations, the jury weighed evidence that Plaintiff got no tangible benefit from the refinance of his $0 per month reverse mortgage with a $76,000 line of credit remaining

into a $1,319 per month conventional 30-year mortgage with $52,000 in cash out. He could have drawn down the $76,000 and continued to pay nothing per month.

The evidence presented at trial shows that, given the totality of the circumstances, Defendant Equihome engaged in predatory lending that violates the unconscionability clause of the CFA. Due to these proofs, "the record contains the minimum quantum of evidence" from which the jury reasonably afforded relief to Plaintiff on his CFA claim.

**B.    The Jury Awarded Plaintiff Damages in the Face Amount of the Predatory Mortgage so Plaintiff Can Pay Off the Mortgage and Stop Foreclosure.**

Defendant's motion to reduce the verdict through remittitur also fails for its naked insistence that the jury awarded too much. Plaintiff sought approximately $287,000 on his CFA claim for his lost home equity and out-of-pocket costs on the predatory mortgage. The jury awarded him $220,000 when the face amount of the loan was $223,000. As explained below, that is a reasonable award under the evidence.

"Remittitur is appropriate if the Court 'finds that a decision of the jury is clearly unsupported and/or excessive.'" *DePuy*, 216 F. Supp.2d at 378 (citing *Spence v. Bd. of Educ. of Christina School Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986)); *see also Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 189 (3d Cir.1998). But the Court is obligated "to uphold the jury's award, if there exists a reasonable basis to do so.... [A] court may not ... reduce the award merely because it would have granted a lesser amount of damages." *Id.* (citing *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir.1989)).

Here, the documentary evidence at trial showed that Plaintiff lost $223,000 of equity in his home due to the predatory refinance. The jury awarded Plaintiff $220,000

before statutory trebling.    *See* Jury Verdict Sheet, Castronovo Aff., Exhibit S. Importantly, the jury's note to the Court requesting guidance on whether it, rather than the Court, trebles damages informs us that the jury closely followed the jury instructions and was deliberate in choosing how much to award Plaintiff.    *See* Jury Note, Castronovo Aff., Exhibit T.   This award of $220,000 clearly seeks to compensate Plaintiff so he can pay off the mortgage to keep his home.   Accordingly, Plaintiff is entitled to "uphold the jury's award [because] there exists a reasonable basis to do so."

Defendant's use of the Consumer Fraud Act's (CFA) "ascertainable loss" doctrine ignores controlling case law.  The New Jersey Supreme Court held that a CFA claimant is entitled to all costs required to give him the benefit of a transaction – including remedial costs. *See Cox v. Sears Roebuck*, 138 N.J. 2, 22 (1994).  In *Cox*, the 82-year old plaintiff hired Sears to renovate his kitchen for about $8,800 in original contract work and additional work. *Id.* at 7.  The plaintiff found Sears' work deficient and refused to pay anything.  He then brought a CFA claim. *Id.*

The jury rendered a verdict for the plaintiff by finding both that the work was deficient and Sears failed to secure the proper construction permits. *Id.* at 9.  Even though the plaintiff paid nothing on the $8,800 contract, the jury awarded the plaintiff $6,830 to repair Sears' deficient work. *Id.*

Sears moved to overturn the verdict on the ground that the plaintiff suffered no loss because he still had his kitchen and the renovation work. *Id.* at 22.  The trial and appellate courts agreed and reversed the verdict by finding no ascertainable loss. *Id.* But the Supreme Court affirmed the jury verdict by finding that the plaintiff suffered an ascertainable loss under the CFA. *Id.* at 22.

The trial court was persuaded by the argument "that because plaintiff 'kept' the kitchen since it had been installed, he did not incur any loss." *Id.* But the Supreme Court's common-sense response was, "Obviously, plaintiff had no other choice [but to keep his kitchen]: he still owned the house. In addition, [the plaintiff] did not 'gain' a kitchen that he had not had before; prior to the renovations, he had a normal, safe kitchen." *Id.* Accordingly, the Supreme Court upheld the $6,830 verdict which compensated Plaintiff for the amount to repair his kitchen even though he never paid for the $8,800 in renovations. *Id.*

Plaintiff's case is similar to *Cox*. Before Equihome's predatory refinance, Plaintiff had a home that was absolutely safe from mortgage foreclosure. After the predatory loan, Plaintiff now faces a pending foreclosure suit. To stop foreclosure, he must give Flagstar Bank (the current mortgagee) $287,000 to pay-off the predatory loan. Reducing the verdict to $53,000 (as Defendant Equihome proposes) does not stop foreclosure unless Plaintiff sells his home. As *Cox* plainly states, Plaintiff already had his home. Making him sell it due to Equihome's consumer fraud does not make him whole. Plaintiff's ascertainable loss includes sufficient recovery to remedy the pending foreclosure.

The whole purpose of this lawsuit is to keep Plaintiff in his home because foreclosure is his ascertainable loss. The jury's verdict of $220,000, trebled to $660,000, accomplishes this litigation goal. <u>That $220,000 is Plaintiff's ascertainable loss of correcting the predatory loan and putting him back into his pre-loan position of being safe from foreclosure</u>. The jury apparently understood this in making the award it did. As such, the verdict is reasonable compensation for Plaintiff's ascertainable loss.

Defendant's requested reduction to $53,000 ignores both the evidence in the record and controlling law while seeking to have the Court substitute Defendant's judgment for that of the jury.  Defendant has failed to meet its burden of showing that the verdict is unreasonable, therefore, it is not entitled to reduce the jury's carefully considered and evidentially-supported award.

## POINT II

## THE LEFF-BERGIDA TAPE RECORDED CONVERSATIONS ARE ADMISSIBLE BECAUSE KEN LEFF LEGALLY RECORDED THEM

After losing its motion *in limine* to exclude the Leff-Bergida tapes, Defendant again asks the Court to exclude the tapes. Again, Defendant offers nothing to rebut the case law that New Jersey law, rather than Florida, applies to these tape recordings. In opposing this argument yet again, Plaintiff submits below his argument submitted in opposition to Defendant's motion *in limine*.

All relevant evidence is admissible except as otherwise provided by law. *See* F.R.E. 402. Evidence is relevant where it makes the existence of any fact of consequence to the determination of the case "more or less probable than it would be without the evidence." *See* F.R.E. 401; *see also Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 109-10 (3d Cir. 1999). The party seeking to exclude evidence bears the burden of proving that the evidence must not be heard by the trier of fact. *See U.S. v. D.K.G. Appaloosas, Inc.*, 630 F. Supp. 1540, 1562 (E.D.Tex. 1986), *aff'd* 829 F.2d 532, *cert. denied* 485 U.S. 976 (1987).

## A.   The Florida Wiretap Law Does Not Apply.

Case law interpreting the Florida Security of Communications Act (the "Wiretap Act"), Fl.St.Ann. § 934.03 states:

(1)   Business communications do not contain a reasonable expectation of privacy, therefore, the Wiretap Act is not violated when business communications are secretly recorded. *See Cohen Brothers, LLC v. ME Corp.*, 872 So.2d 321, 324 (3rd Dist. 2004);

(2)   An "interception [under the Wiretap Act] occurs where the words or the communication is <u>uttered, not where it is recorded</u> or heard." *Id.*; and

(3)     Lawfully   obtained   secret   recordings   are   admissible   evidence. *Op.Fl.Atty.Gen.,* 076-195 (September 23, 1976).

Here, Bergida testified at deposition that each of his conversations with Ken Leff occurred in New Jersey while Bergida was conducting business for Equihome.  In three of Bergida's four conversations with Ken Leff, Bergida was "sitting in [his] office at Equihome in Bernardsville, New Jersey."  The fourth conversation was on Bergida's cell phone in Bergida's car while traveling in New Jersey.  *See* Bergida Dep. at 42:7 to 44:14.  Since Bergida was conducting business as an Equihome employee, he had no expectation of privacy for these business communications.  Moreover, he uttered the communications in New Jersey, therefore, the Wiretap Act does not apply.

**B.     The Tapes Are Admissible Under Both the Federal and New Jersey "One-Party" Wiretap Statutes.**

The New Jersey Wiretapping and Electronic Surveillance Control Act states that, "It shall not be unlawful under this act for: ... A person not acting under color of law to intercept a wire, electronic or oral communication, where such person is a party to the communication[.]"  N.J.S.A. 2A:156A-4d.  As such, New Jersey is a so-called "one-party" state where communications may be secretly recorded by one party to the conversation.  *Id.*; *see also D'Onofrio v. D'Onofrio,* 344 N.J.Super.  147, 154 (App.Div. 2001) (tape recording one's own telephone conversations with another does not violate New Jersey law or the federal wiretap statute).

The federal statute is nearly identical to New Jersey: "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or

19

electronic communication where such person is a party to the communication[.]" *See* 18 U.S.C.   2511(2)(d).   Since Ken Leff recorded his own telephone conversations with Jeffrey Bergida,  Ken Leff did not violate New Jersey or federal law.

As there is no violation of law, the recordings were properly admitted because they are relevant evidence under *F.R.E.* 401 and 402.   Accordingly, Defendant's second motion to exclude the tapes should be denied.

## POINT III

### THE COURT PROPERLY ADMITTED PLAINTIFF'S VIDEOTAPED DEPOSITION TESTIMONY BECAUSE DEFENDANT ADMITS HE WAS UNABLE TO APPEAR AND IT CANNOT SHOW UNDUE PREJUDICE

At trial, the deposition of a witness may be admitted "if the court finds…that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment[.]"   *Fed.R.Civ.P.* 32(a)(3)(C).   The trial court's decision on whether to admit deposition testimony can be reversed only by showing an abuse of discretion. *See Crossley v. Lieberman,* 868 F.2d 566, 568-69 (3d Cir. 1989) (citing F.R.E. 403).

In *Crossley,* the district court found evidence that the 68-year old plaintiff was too sick to appear in Court to testify at the trial.   "The District Court contemplated the probable deterioration of [the plaintiff's] physical condition" in the time between her deposition and the trial.   *Id.*   Like Defendant Equihome, the defendant in *Crossley* claimed undue prejudice because he took the plaintiff's deposition "for discovery purposes" and "was deprived of the opportunity to cross-examine [the plaintiff]."   *Id.*

The *Crossley* Court rejected the defendant's argument because the defendant "was given very broad latitude in questioning [the plaintiff]" at deposition.   Moreover, the defendant, despite knowing in advance of the plaintiff's likely inability to appear at trial, failed to conduct a *de benne esse* deposition of the plaintiff for use at trial.   As such, the Third Circuit held that the District Court properly found that the probative value of the plaintiff's deposition outweighed any prejudice to the defendant.   *Id.* (citing F.R.E. 403); *see also Jones v. U.S.,* 720 F. Supp. 355 (S.D.N.Y. 1989) (holding that deposition testimony was properly admitted at trial on eight days' notice due to physician witness' inability to appear at trial due to illness).

Similarly, Defendant Equihome cannot show any undue prejudice by the Court's ruling to allow Plaintiff to testify at trial through his deposition. As a threshold matter, Defendant Equihome admits that the physician it hired to examine Plaintiff opined that Plaintiff was too sick to appear at trial for at least three weeks. As such, Plaintiff's inability to attend trial is undisputed.

The only issue, then, is undue prejudice. Like *Crossley*, Defendant Equihome had ample notice that Plaintiff might be too sick to attend the trial. The Court's Pretrial Order dated January 8, 2007 (five months before trial) expressly states that, "Plaintiff may be physically unable to attend trial. If so, Plaintiff's videotaped deposition testimony will be presented to the jury." *See* Revised Final Pretrial Order ¶ 14, Castronovo Aff., Exhibit U.

Indeed, Plaintiff's counsel paid to have Plaintiff's December 2005 deposition videotaped because the parties predicted that Plaintiff might be unable, by sickness or death, to testify at trial. Ignoring these indicators of unavailability, Defendant Equihome, like *Crossley,* declined the opportunity to conduct a videotaped *de benne esse* trial deposition of Plaintiff with the alleged cross-examination that it claims it was unable to conduct through seven hours of deposition.

Defendant fails to show that the Court abused its discretion in allowing Plaintiff to testify at trial through his videotaped deposition where the jury could see him speak and observe his demeanor. Having failed to show undue prejudice, Defendant Equihome is not entitled to a new trial based on this piece of evidence.

22

## POINT IV

## DEFENDANT IS NOT ENTITLED TO THE EXTRAORDINARY REMEDY OF AN UNSECURED STAY BECAUSE IT HAS DEMONSTRATED NEITHER THE MEANS NOR THE WILL TO GUARANTEE PAYMENT OF THE JUDGMENT

*Rule* 62(d) provides: "When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay [of execution of the judgment]." The *Rule* continues that the "bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court." By requiring a defendant to post such a bond, the Court protects the prevailing plaintiff from the risk of being unable to collect his judgment in the years an appeal is processed and the bond compensates him for the delay in entering final judgment pending appeal. *See Hebert v. Exxon Corp.*, 953 F.2d 936, 938 (5th Cir. 1992).

The party seeking waiver of the bond must demonstrate that posting a full bond is impossible or impractical. *See U.S. v. Kurtz*, 528 F.Supp. 1113, 1115 (E.D.Pa. 1981), *aff'd* 688 F.2d 827 (3d Cir.), *cert. den.* 459 U.S. 991 (1982). Posting a bond can be waived only in "extraordinary circumstances." *Id.* In determining whether the bond should be waived, the Court examines several factors:

(1) the complexity of the collection process;

(2) the amount of time required to obtain a judgment on appeal;

(3) the degree of confidence that the Court has in the availability of funds to pay the judgment;

(4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and

23

(5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place the other creditors of the defendant in an insecure position.

See *Hurley v. Atlantic City Police Dept.*, 944 F. Supp. 371, 374 (D.N.J. 1996) (citing *Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988)). Of the relevant factors to consider under *Rule* 62(d), "the factor that is most commonly used to waive the bond requirement is the financial hardship that the bond may impose on the appellant." *Id.* at 377 (citing *Dillon*, 866 F.2d 902) [emphasis added].

*Hurley* is the only published federal decision in New Jersey that considers this issue. While its principles of analysis apply to this case, its holding does not because *Hurley* dealt with a public entity that was statutorily exempt from posting appeal bonds due to its financial solvency through the power to tax. *Id.* at 373. But *Hurley's* reliance on *Kurtz* (a District Court opinion in the Third Circuit) is instructive.

In *Kurtz*, the defendant was, like Defendant Equihome, a non-governmental defendant. *See* 528 F.Supp. 1113, 1114. The defendant sought to waive posting a bond by claiming he was financially unable to do so. The Court denied his request and required a bond in the full amount because the defendant "offer[ed] only his unsupported allegation that he is financially unable to satisfy the judgment or to post a bond" and he offered no alternate form of security. *Id.* at 1115.

## A.    Defendant Has Not Demonstrated the Assets Necessary to Waive Bond.

Defendant Equihome seeks waiver of security under *Hurley's* Factor 4 (judgment security through the judgment debtor's financial strength). It does not claim any hardship in posting a bond; it alleges just the opposite. But like the *Kurtz* defendant,

24

Defendant Equihome fails to provide any information regarding its financial condition. It nakedly alleges that it has sufficient financial means to secure judgment without the minor expense of posting a bond (a surety premium equal to 2% of the judgment). *See* Surety Group Premium Estimate, Castronovo Aff., Exhibit V. It fails to provide an audited income statement, cash flow statement, or balance sheet. As such, there is not a shred of proof to support its position.

But Plaintiff has done his own research which cries out for Defendant to post security. Plaintiff purchased a Business Information Report on Defendant Equihome from the noted financial firm of Dunn & Bradstreet (D&B). *See* Castronovo Aff., Exhibit W. The D&B report shows a startling lack of information on Equihome. In Plaintiff's counsel's surety litigation experience, most financially sound companies have quite an extensive financial history through D&B. Notably, the D&B report shows at page three that Equihome has failed to pay a small November 2006 judgment against it as well as another small judgment from March 2007.

Moreover, Equihome is engaged in the rapidly-declining mortgage business. Recent news confirms that the mortgage industry is in a troubled state with two of the top ten largest mortgage originators (American Home and New Century) filing for bankruptcy in recent months with many others now refusing to accept new applications. *See* News Article, Castronovo Aff., Exhibit X. Even if the Court is inclined to accept Equihome's self-serving certification of financial health, that is no guarantee of solvency in the months or years it will take to resolve its appeal. As the attached article states, the collapse of the bankrupt mortgage lenders was swift. Equihome cannot be presumed to be an exception to the mortgage industry maelstrom.

In short, Equihome's unsupported allegations of fiscal soundness and the turmoil of its industry scream for a bond to be posted to secure Plaintiff's judgment.

**B.      Equihome Cannot Be Trusted to Preserve Its Assets Pending Appeal.**

Bluntly put, Equihome's word is worth nothing. A jury found it liable for consumer fraud and it has refused to honor the settlement agreement it entered with Flagstar Bank during the trial. *See* Flagstar Letter, Castronovo Aff., Exhibit Y. With Equihome's despicable history of dodging its financial obligations, it has not demonstrated the "extraordinary circumstances" required to waive security for Plaintiff's judgment. Consequently, Defendant Equihome must be required to secure the full amount of Plaintiff's judgment either by bond through an A-rated surety or by depositing all funds into Court.

## POINT V

## PLAINTIFF IS ENTITLED TO HAVE DEFENDANT POST A COSTS BOND TO GUARANTEE PAYMENT OF ALL POST-JUDGMENT INTEREST, APPEAL COSTS, AND ATTORNEYS' FEES

*Rule* 7 of the Federal Rules of Appellate Procedure empowers the District Court to order a judgment debtor, such as Defendant Equihome, to post a "costs bond" in addition to a supersedeas bond. *See Adsani v. Miller*, 139 F.3d 67, 70 (2d Cir.), *cert. den.* 525 U.S. 875 (1998). The costs bond is designed to ensure payment of costs and fees that arise after entry of judgment while an appeal is taken. *Id.* The *Adsani* Court ordered the appellant to post a costs bond for "$35,000 to cover the costs and attorney's fees upon appeal pursuant to Rule 7 of the Federal Rules of Appellate Procedure." *Id.* The Court imposed the costs bond due to the risk of non-payment posed by the appellant. *Id.* at 75.

In this case, as discussed immediately above, Defendant Equihome has shown a disturbing unwillingness to honor its financial obligations. It has already reneged on its settlement agreement with Flagstar Bank (see Exhibit Y) and it has not paid other judgments against it (see Exhibit W). Given the meltdown of the mortgage industry, Plaintiff faces the possibility that Defendant's unwillingness to pay will be exacerbated by a later inability to satisfy the judgment. In accord with *Adsani*, Plaintiff is entitled to additional relief to secure the costs incurred while Defendant appeals. These costs are post-judgment interest (about $39,000 per year at 5% of the judgment), attorneys' fees ($15,000 for post-trial motions and appellate work), and appellate costs ($500).

Consequently, Plaintiff will be secured if Defendant posts a costs bond for $54,500 in addition to the supersedeas bond for the full $780,787.33 judgment.

## **CONCLUSION**

For these reasons, Plaintiff asks the Court deny Defendant's motions and to order posting of both a supersedeas bond and a costs bond.

Respectfully submitted,

**Paul Castronovo, LLC**
**Attorneys for Plaintiff**

Dated: August 7, 2007                    By:_____

PAUL CASTRONOVO

28